SWEENEY, Respondent, vs. STENJEM, Appellant.

*December 6, 1955—January 10, 1956.*

For the appellant there was a brief by *Hugh F. Oldenburg,* attorney, and *Byron C. Ostby* of counsel, both of Madison, and oral argument by *Mr. Ostby.*

For the respondent there was a brief by *Spohn, Ross, Stevens, Lamb & Pick* of Madison, and oral argument by *Myron Stevens* and *James F. Spohn.*

MARTIN, J.   South Side Development Company of Madison was the owner of two lots in Woodlawn Addition to South Madison; on July 9, 1953, it accepted the written offer of the plaintiff to purchase said lots for $4,500. Among other things the contract provided:

"This offer is conditioned upon the zoning of the said premises being changed to Commercial B. You shall agree to co-operate with me in securing such change."

". . . I have handed to you the sum of one hundred dollars ($100) as an earnest money payment upon the purchase price of the above-described property."

Upon delivery of the signed acceptance "this memorandum shall constitute a binding contract. If this offer is not accepted or if it is accepted and the zoning is not changed to Commercial B, such payment shall be returned to me.

"Upon acceptance hereof and upon the changing of the zoning to Commercial B, you shall within reasonable time give to me a complete abstract of title continued to date showing merchantable title in you free and clear of all liens and incumbrances. I shall have a reasonable time within which to examine such abstract, whereupon the transaction shall be consummated as above provided."

The first question of the special verdict asked:

"Did plaintiff Sweeney and South Side Development Company enter into a contract on or about July 9, 1953, for the sale by the company to Sweeney of lots 28 and 29 here involved?"

This was answered in the affirmative by the trial court.

Plaintiff circulated and filed with the city clerk a petition for the zoning change of the property in question, which was refused by the city council on September 10, 1953. Thereafter plaintiff told Frank Kowing, president of the South Side Development Company, that the petition had been turned down; that it looked as though their deal was off and asked him if he would return the $100. Kowing said that he thought that he could get the zoning changed and plaintiff told him to go ahead, "I am all for the deal yet."

Mr. Kowing's version of the conversation when plaintiff asked for the return of the earnest money was that Kowing said, " 'I still think that I can get the zoning changed and . . . if I can get the zoning changed, then we would be in a position to talk a new deal.' So with the thought in mind I instilled in him I could get the zoning changed, he said, 'Well, we will just let the thing ride along and see what you do.' "

Plaintiff testified, "the contract was definitely not canceled." That Kowing likewise considered the contract still in force thereafter is evidenced by the fact that although he understood the return of plaintiff's earnest money to be an obligation attendant upon termination of the contract (he returned it the day after he accepted defendant's offer), he did not return it at the time plaintiff's petition for rezoning was rejected.

Question 2 of the special verdict inquired:

"Was the contract, referred to in question 1, later rescinded by mutual consent of Sweeney and South Side Development Company *before* defendant Stenjem completed his purchase from South Side Development Company of these same lots?"

The jury answered this question "No," and the evidence amply supports the finding. Plaintiff's offer being conditioned upon the change in zoning and defendant's agreement to "co-operate" in securing such change, considered in connection with both plaintiff's and Kowing's testimony as set

out above, the jury could well conclude that the contract was to continue in force until it was ascertained whether Kowing could secure the change.

Kowing's petition for the zoning change was approved by the city council on January 14, 1954, and a few days later plaintiff called him and requested that he submit the abstract for examination so that the sale could be completed. It is significant that plaintiff was not advised at this time that Kowing considered the contract terminated.

On January 20th Kowing was approached by an agent of the defendant and gave him an option to purchase the lots in question for $5,500; he accepted the defendant's offer on January 25th. On January 26th Kowing returned plaintiff's $100. South Side Development Company delivered its deed to the defendant on January 28th; it was recorded on the following day; and on February 5, 1954, defendant sold the lots to Byrns Oil Company for $7,500.

Defendant contends that plaintiff had no cause of action because he neither alleged nor proved fraud. His argument is that the law in Wisconsin is well settled that a person who maliciously induces another to break his contract with a third person is liable to such third person only where the evidence shows malice or wrongful intent, but he cites no case from this jurisdiction. In *McLennan v. Church* (1916), 163 Wis. 411, 158 N. W. 73, the defendant had a contract to sell certain lands to the plaintiff which plaintiff had contracted to sell to one Curby. Thereafter Curby, knowing of the McLennan contract with Church, purchased the lands directly from Church. In considering the finding that Curby had purchased the land from Church in good faith without any intention of defrauding the plaintiff, this court said (p. 419):

"Curby knew when he negotiated with the Churches and dealt with them that plaintiff held the contract in question, and knew all the circumstances requisite to charge him with

knowledge that such contract had not lapsed. The fact that he did not know the legal effect of such circumstances, and ignorantly supposed that a mere default of appellant terminated his contract rights, and in that state of mind dealt with the Churches, may relieve him from any taint of moral turpitude, but not of remediable responsibility. Fraud in law is remediable as well as fraud in fact. It was certainly a fraud on appellant for Curby and the Churches to collude, as they evidently did, to consummate a sale to Curby and thus to rob appellant of the value of his bargain under his contract. With knowledge of the obligation to appellant under such contract, Curby offered the Churches an advance upon the price named therein, as an inducement to L. F. Church to break his agreement and sell to him. He was improperly held guiltless of any fraudulent intent. The breaking of the contract was an unlawful act rendering all who concerted together to that end liable for the damages caused thereby to appellant."

Here the fraudulent intent is inferred from the fact that defendant, having knowledge of the existence of plaintiff's contract, proceeded to consummate a deal which destroyed plaintiff's rights under that contract. In *Campbell v. Gates* (1923), 236 N. Y. 457, 141 N. E. 914, the general rule is well stated as follows (p. 460):

"The great weight of authority in this country and in England is to the effect that if A. has a legal contract with B., either for the rendition of service or any other purpose, and C., having knowledge of the existence thereof, intentionally and knowingly and without reasonable justification or excuse induces B. to break the contract, by reason of which A. sustains damage, an action will lie by A. against C. to recover the same. . . . The action of C. is malicious in that, with the knowledge of A.'s rights, he intentionally and knowingly and for unworthy or selfish purposes, destroys them by inducing B. to break his contract. It is a wrongful act, done intentionally, without just cause or excuse, and from this a malicious motive is to be inferred. This does not necessarily mean actual malice or ill-will, but the intentional doing

of a wrongful act without legal or social justification. The action is predicated not on the intent to injure, but on the intentional interference, without justification, with A.'s contractual rights, with knowledge thereof. It is a legal wrong and one who commits it, if damage be sustained, must answer therefor."

The third question of the special verdict inquired:

"Did the defendant, Eldon M. Stenjem, Jr., before he completed his purchase from the South Side Development Company, have such knowledge of the plaintiff's interests as would put a prudent man upon inquiry?"

The jury answered "Yes." What was defendant's knowledge of the contract between plaintiff and South Side Development Company? Defendant testified that sometime between January 26th and 28th, when Mr. Kowing delivered the abstract to him, Kowing told him his attorney was William Sachtjen and "he mentioned that he had had a former offer or contract which was now null and void on this particular property;" that he may have mentioned plaintiff's name at that time; that "he merely stated that he had formerly had an offer which had something to do with a condition of some kind—or rezoning." Defendant then called Mr. Sachtjen, who informed him of the efforts of Mr. Sweeney, the plaintiff, to get the zoning changed, which had failed, and of the successful efforts of Mr. Kowing. This conversation occurred prior to the completion of defendant's purchase from South Side. Sachtjen also told defendant that in his opinion Sweeney "had given up hopes of achieving the zoning change and it was my opinion that in Mr. Sweeney's mind his relationship had terminated with Mr. Kowing."

Thus, defendant knew that Sweeney had had a contract with Kowing and that it was conditioned upon the property being rezoned; he also knew that the property had in fact been rezoned. In our opinion this knowledge was such as

would put a prudent man on inquiry, and supports the jury's finding in that respect. The very fact that the vendor and his attorney had informed defendant that Sweeney's contract had been terminated constituted notice of the existence of such contract, and it was incumbent upon him to make such inquiry as would apprise him of the true facts. In *Neillsville Shipping Asso. v. Lastofka* (1937), 225 Wis. 350, 274 N. W. 280, the plaintiff co-operative association sought damages from the defendant for interference with its marketing contract with a member of the association, one Galbreath, from which the defendant had bought certain livestock. Prior to such purchase Galbreath had told Lastofka that he was no longer a member of the association. In holding that the defendant had actual knowledge of the contract, this court said (p. 355):

"While Galbreath told the defendant that he was no longer a member of the association, that was a misrepresentation which in no manner affected the rights of the plaintiff association under its contract with Galbreath. The defendant must be presumed to have known the law that such a contract remains a valid contract as to all persons until its expiration according to its terms or until canceled by mutual agreement in writing or by the final judgment of a court in an action to annul the same, and that whenever such a contract shall have terminated in any of the ways above mentioned the association shall, on demand, give to the member a certificate to that effect, and the member shall, within ten days thereafter, cause the said certificate to be filed with the register of deeds in whose office the copy thereof was filed. Sec. 185.08 (7), Stats. When the defendant was told by Galbreath that his membership in the association had terminated, the defendant received actual notice of the fact that Galbreath had been a member of the plaintiff association,—a fact sufficient to put him, as a prudent man, upon inquiry, which if prosecuted with ordinary diligence, would have led to actual notice of the existence of the contract."

The fourth question of the special verdict inquired:

"Did the defendant, Eldon M. Stenjem, Jr., use ordinary diligence to ascertain the interests of the plaintiff, Charles F. Sweeney, in the lands in question?"

The jury answered "No." This finding is also supported by the evidence. Defendant admitted that he did not call the plaintiff, the one person who could have given him reliable information regarding the existence of the contract; he gave no reason for failing to do so, although they were both licensed realtors and had known each other for some time. It is apparent from defendant's testimony that he was in considerable haste to complete the purchase because the time prescribed in his options with South Side and with Byrns Oil Company was short. The record shows that defendant's negotiations with Kowing began on January 20, 1954, and ended on January 28th when he received a deed to the property. His offer from the oil company specified February 1, 1954, as the closing date for that transaction.

A reading of the testimony shows that defendant made no real inquiry at all about Sweeney's interest in the land. The information he received from Kowing was purely voluntary. The testimony of Sachtjen also strongly indicates that his information to Stenjem about the contract was not solicited but given voluntarily in connection with their discussion of the rezoning history of the property.

The question is also presented whether a purchaser of land is entitled to the benefits of the recording act when he has some knowledge of a prior conditional executory contract relating to those lands. Defendant relies on sec. 235.49, Stats., which provides that an unrecorded conveyance of real estate "shall be void as against any subsequent purchaser in good faith." The jury found, on substantial evidence, that the defendant was not a purchaser in good faith; he cannot, therefore, look to the statute to protect him from the consequences of his wrongdoing.

*By the Court.*—Judgment affirmed.