SILBERMAN, Respondent, v. ROETHE, Defendant: WEATHERBY/NASCO, INC., Appellant.*

*No. 330. Argued April 3, 1974.—Decided June 17, 1974.*
(Also reported in 218 N. W. 2d 723.)

---

[7] *See Simos v. State* (1972), 53 Wis. 2d 493, 192 N. W. 2d 877.

[8] (1968), 40 Wis. 2d 79, 161 N. W. 2d 209.

[9] (1959), 360 U. S. 343, 79 Sup. Ct. 1217, 3 L. Ed. 2d 1287.

* Motion for rehearing denied, with costs, on October 1, 1974.

132

For the appellant there were briefs by *Borgelt, Powell, Peterson & Frauen,* attorneys, and *Reuben W. Peterson, Jr.,* and *Robert C. Burrell* of counsel, all of Milwaukee, and oral argument by *Reuben W. Peterson, Jr.*

For the respondent there was a brief by *Laurence C. Hammond, Jr.,* and *Larry J. Martin* and *Quarles, Herriott, Clemons, Teschner & Noelke,* all of Milwaukee, and oral argument by *Mr. Hammond.*

WILKIE, J.   Because of the relatively complicated fact situation surrounding this dispute, a summary of the pertinent testimony is appropriate before we consider the issues on this appeal.

*Morry A. Silberman—plaintiff.*

Morry testified that in November of 1965 his brother Irv told him that Nasco was quite sincere and interested in acquiring Milway and he showed Morry the letter from Leo Roethe, except for the portion of the letter relating to Irv's salary, which he concealed. Morry testified that Irv asked him to reduce the debt owed him by Milway. He then testified that he contacted his attorney, Alan Marcuvitz, who handled the matter for him. An agreement was worked out and Marcuvitz recommended that he sign the agreement. Morry testified that his attorney told him he felt the agreement was a fair deal and that he would be in a better position and more secure in the money he had coming to him and that Nasco would strengthen Milway and put it on a sound financial basis and he would have a chance of receiving his money.

Morry testified that it was three or four months before he became informed that Nasco was not running Milway.

On cross-examination Morry testified that he had never met Roethe or Burgess and had never negotiated with anyone. His attorney handled that and all his information came from his attorney. Morry testified that they did discuss concern over Milway's financial condition and he admitted that the receipt of $65,000 in cash was important to him at that time.

*Irv Silberman.*

Irv Silberman testified (by deposition since he was in California at the time of the trial) that he sold his stock interest in Milway on December 17, 1965, after negotiating with Nasco through its president, Leo W. Roethe. Irv testified that after receiving a letter from Roethe proposing a purchase by Nasco, he showed the letter to his brother Morry, except for one paragraph which he covered. Irv testified that he attended at least two meetings with Leo Roethe and Walter Davis and that there was never any question that Nasco was acquiring the stock. Irv testified in the deposition that there was never any mention of Leo Roethe or Burgess acquiring the stock, and that to his knowledge the question of the indebtedness to Morry was never raised. Irv testified that he had conversations with Roethe in which Roethe talked about the assets of Nasco.

*Leo W. Roethe—one defendant and president of Nasco.*

Mr. Roethe (called adversely) testified that he had sent the original letter to Irv Silberman on behalf of Nasco with the proposed purchase subject to approval of the board of directors. Roethe testified that the question of the reduction of Morry's note was handled by Burgess. He testified that reduction of the note was a condition of the offer to purchase. Roethe also testified that he

thought he mentioned to Irv Silberman, prior to the December 14, 1965, board meeting that if Nasco did not buy Milway, they would try to work out a deal whereby he and Burgess would buy it. Roethe also testified that Irv was informed that the board of Nasco had declined to acquire Milway. Roethe testified that the reorganization agreement entered into between Nasco and Milway was an accommodation to Irv Silberman so that he would have tax advantages from the form of transfer and that Irv Silberman and Van Deuren knew at the time that Nasco was not actually going to purchase Milway. Roethe testified that he was interested in purchasing Milway only because he hoped to get his money out of Selective Finance which was formed to purchase Milway's receivables. Roethe testified again that he did not give final approval to the reduced indebtedness figure of $137,500. Roethe testified that at the time of the reduction agreement, Nasco had already withdrawn its proposed acquisition. At this point in the trial, documents were introduced showing that Milway had gone into receivership within one and one-half years after the sale.

*Walter Davis—general counsel for Nasco in 1965.*

Mr. Davis testified that prior to the Nasco board meeting he attended at least two meetings with Irv Silberman, Milway's attorney and Leo Roethe, at which meetings he believed that the necessity of Morry's reducing his claim was discussed. Davis testified that prior to the board meeting of December 14, 1965, they were representing Nasco. Davis testified that the minutes of the December 14, 1965, Nasco board meeting indicated that Nasco decided they did not want to own Milway, but also that they did not want to turn down the proposition and give it to Burgess and Roethe without some claim on Milway if it became successful. Therefore, they agreed to participate in the acquisition and immediately sell Milway to

Burgess and Roethe with an option to repurchase within ten years.

Davis testified that there were negotiations between the 14th and the 17th of December in which he was involved and that he informed Mr. Van Deuren that Nasco was not going to hold the Milway stock after the December 14, 1965, meeting. Davis testified that he did not see the reduction agreement until after it was signed by Morry Silberman and it was shown to him as part of the closing papers "so that we knew, in fact, what had been negotiated, had been accomplished." Davis testified that he was aware that there were negotiations on reduction of the debt and that Roethe or Burgess made the final judgment on whether the terms were satisfactory. Davis testified that he did not recall any telephone conversations in regard to the terms but he did recall being in Van Deuren's office and being advised as to what Morry was going to agree to. Davis testified that he never spoke to Morry Silberman to inform him of Nasco's decision not to acquire Milway. He testified that he did not believe that he, Roethe or Burgess ever said one word to Morry Silberman about anything because it was a matter that Irv and Morry had to work out between themselves and he had no idea at all how Van Deuren and Irv Silberman communicated with Morry. Davis testified that his dealings with Van Deuren were strictly as attorney for Milway and apparently he believed that Van Deuren was communicating with Morry Silberman as attorney for Milway.

On cross-examination (plaintiff had failed to call Davis adversely) Davis testified that after Nasco decided not to acquire Milway, personal guarantees of Irv Silberman's salary and a rental agreement were executed by Burgess and Roethe because Nasco no longer wished to execute any guarantees. On redirect, Davis testified that to his knowledge no one told Morry about the change in

guarantees. On recross Davis testified that the form of the transaction (a stock reorganization) was desired by Irv Silberman and Milway and on redirect Davis stated there was no misrepresentation because he had told Van Deuren that the stock would be transferred to Roethe and Burgess eventually.

*Alan Marcuvitz—Morry Silberman's attorney in 1965.*

Marcuvitz testified that he first discussed the reduction of Morry's claim with him on December 11, 1965, when he learned that Nasco was interested in buying Milway. Morry told him to contact Mr. Richard Van Deuren and to continue negotiations. Marcuvitz testified that he conferred with Van Deuren over several days beginning on December 14, 1965. He was asked what was discussed and the defense objected on grounds of hearsay. The court overruled the objection saying that while this might be hearsay with respect to the plaintiff and defendant it was the guts of this lawsuit. Marcuvitz then testified that Van Deuren advised him that at the time he was "acting as the middle man between Morry Silberman and the people who were purchasing the company who he identified to me as Nasco." The defense objected again and the court overruled the objection, stating it felt that when a corporation purchases it purchases everything including conversations with Mr. Van Deuren. Marcuvitz testified then that Van Deuren said he would communicate with Walter Davis, the attorney for Nasco, for Marcuvitz and Morry and relay back his answers. Marcuvitz testified that on December 17, 1965, he and Marvin Klitsner were present at a meeting in Van Deuren's office where the deal was hammered out. After the final terms were agreed upon, Marcuvitz and Klitsner agreed to prepare the document and left. The document was completed late in the day of December 17, 1965. Marcuvitz testified that a year and one-half later, Morry

called his attention to newspaper articles indicating Milway was in financial trouble. Marcuvitz testified that he wrote a letter to Nasco and Roethe and Milway stating he would hold them responsible for any default. A letter in response from Mr. Davis was offered in which Davis denied that the debt of Milway to Morry was in any way the responsibility of his clients, Nasco or Roethe.

On cross-examination by the defense, Marcuvitz testified that Van Deuren confirmed that Nasco insisted on a reduction and that he never spoke directly to Davis, Burgess or Roethe. Marcuvitz testified that he understood Van Deuren was communicating to him what he had been told to communicate to him by Davis. He testified that he knew Van Deuren was Milway's counsel at the time and was acting for Milway. Marcuvitz testified that he believed that in one or more conversations Van Deuren suggested that he consider what might occur if Nasco did not acquire Milway and strengthen it. Marcuvitz testified that his recommendation to Morry to accept the agreed-upon reduction was his opinion of the present and future of Milway, Inc., and his opinion that Morry's short-term position would be significantly improved. He further testified he felt Morry would be dealing with a stronger company in the future. Marcuvitz testified that until the summer of 1967 he believed, on the basis of everything he had been told, that Nasco had purchased the Milway stock and he did not learn of the guarantees given to Irv Silberman until the day of the present trial. Marcuvitz testified that under the circumstances he did not feel it was necessary to get a guarantee of Morry's claim. Marcuvitz testified he was willing to take a new note from Milway because another company was agreeing to strengthen the company and put it on a sound financial footing. He testified that Van Deuren

commented that as much money as necessary would be put into the company.

*Marvin Klitsner—attorney for Lou Silberman, whose loan to Morry Silberman was collateralized by the claim against Milway.*

Klitsner testified that Van Deuren was involved as the counsel for Milway and as a go-between on behalf of Nasco, which was represented by him to be the potential purchaser of Milway stock. Klitsner testified that Van Deuren indicated that Nasco, a public company, would be in a position to, and have every reason to, sufficiently strengthen Milway so as to avoid any financial jeopardy or danger. Klitsner inquired what the degree of investment would be and what additional assurances might consist of. He testified that he ended up with the impression that they could not get any assurances as to the degree of additional investment that would be made in the company; that the principal assurance would be that it would be taken over by a company that had assets and a reputation to maintain and would have every reason to make sure the company succeeded. Klitsner testified that the "whereas" clauses in the reduction agreement were "our best effort to reflect in writing the sum and substance of the representations made to us on behalf of Nasco by Mr. Van Deuren, as I said, as more or less a go-between."

On cross-examination Klitsner testified that he was told that no specific amount would be committed (as investment in Milway) and that they would have to rely on the good-faith desire of a company like Nasco to make certain its reputation was protected and to do whatever was necessary to prevent a subsidiary from getting into financial default. He also testified that at some point he inquired whether a guarantee was available and was told it was not. Klitsner testified if he had thought individuals

were taking over the company he would have insisted on a guarantee.

One issue is dispositive of this appeal: Has the plaintiff established his right to recover damages from the defendant on the basis of promissory estoppel?

In *Hoffman v. Red Owl Stores, Inc.*,[1] this court approved and adopted the use of the doctrine of promissory estoppel as stated in sec. 90 of Restatement, 1 Contracts, as a needed tool which courts may employ in proper cases to prevent injustice. The conditions necessary for application of the doctrine are:[2]

"(1) Was the promise one which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee?

"(2) Did the promise induce such action or forbearance?

"(3) Can injustice be avoided only by enforcement of the promise?"

*Injustice.*

In *Red Owl* this court stated that the first two questions were of fact for the trier of fact, but the third requirement involved a policy decision by the court which necessarily embraces an element of discretion. We do not have a trial court opinion here denying motions after verdict. Accordingly, we must make our own independent determination of this policy question.

Neither the *Red Owl Case* nor the handful of cases following it which concern the doctrine of promissory estoppel have discussed in detail any factors which can be useful in determining whether injustice will result from nonenforcement of the alleged promise.

---

[1] (1965), 26 Wis. 2d 683, 133 N. W. 2d 267.

[2] *Id.* at page 698; *Forrer v. Sears, Roebuck & Co.* (1967), 36 Wis. 2d 388, 153 N. W. 2d 587; *Babler v. Roelli* (1968), 39 Wis. 2d 566, 159 N. W. 2d 694.

In discussing the doctrine of promissory estoppel, Corbin [3] described the various types of reliance and the difficulties they pose. He stated that in some cases "the action in reliance may be of a kind that can hardly be measured, as where the promisee forbears to collect a debt in reliance on the defendant's promise to pay it. Had he not forborne, would he have collected? Sometimes, this cannot be determined; at other times a reasonably definite opinion can be formed." The situation in the present case is similar to the situation Corbin described. Here the plaintiff claims to have reduced a debt owed to him in reliance on the promise of the defendant. If he had refused to do so and the purchase of the company had not occurred, would he have collected his claim? Or if he had refused to reduce the debt and the purchase occurred anyway, the plaintiff would be in worse financial condition with a larger unpaid claim. The plaintiff-respondent argues in his brief that these factors should not be considered because the handling of the company by Roethe and Burgess makes the question of what might have happened had they not acquired Milway forever unanswerable. However, this begs the question. The issue is really that in a case like the present one it is very speculative that the plaintiff has actually suffered from his action in reliance.

The facts establish that at the time of the reduction of his claim, the plaintiff was owed $206,000 and was receiving payment in the sum of $10,000 per year including interest. At that rate it would be an extremely long time before the debt would be paid in full. Marcuvitz testified that he was aware that Milway was declining but insisted that it was not his personal opinion that the company was close to bankruptcy. By the terms of the reduction agreement the plaintiff was to receive a cash payment of $65,000 and a note for $72,500, payable over

---

[3] 1A Corbin, *Contracts*, pp. 235, 241, sec. 205.

a five-year period at the rate of $15,000 per year with six percent interest on the unpaid balance. These were very favorable terms. The plaintiff did receive the cash payment and the first year's installment of $15,000 plus interest. The remaining balance was $57,500, which the plaintiff seeks to recover in this action. The plaintiff testified that it was important to him to receive the cash payment and the record reveals he was involved in a divorce and property settlement at the time.

The plaintiff's attorney, Marcuvitz, testified at the divorce proceedings that he calculated what monetary advantages would accrue to the plaintiff because of the new terms of Milway's obligation. He testified that he figured that under the terms of the old agreement he expected a yield over a five-year period of $50,000, and if the funds were immediately invested, the total return would be $56,960. Marcuvitz then calculated the return to be expected from the immediate cash payment and yield of $15,000 per year plus interest. He calculated that over a five-year period the loan payments and interest from their investment would yield $173,800. Thus the actual reduction of the loan, if the new terms were kept and the debt liquidated over the five-year period, would actually be very little. The alleged promisor, on the other hand, is claimed to have entered an open-ended agreement to keep the company operating so that the debt repayment would be accomplished. This "promise" could be expected to exceed hundreds of thousands of dollars if whatever was necessary to keep the company operating had to be provided. In this light the "bargain" appears highly weighted in the plaintiff's favor.

The tentative draft of the Restatement of Contracts Second comments on the character of the reliance protected by sec. 90.[4]

[4] Restatement, *Contracts*, 2d (Tentative Draft No. 2, 1965), p. 216, ch. 4, sec. 90, comment *b*.

". . . The promisor is affected only by reliance which he does or should foresee, and enforcement must be necessary to avoid injustice. Satisfaction of the latter requirement may depend on the reasonableness of the promisee's reliance, on its definite and substantial character in relation to the remedy sought, on the formality with which the promise is made, on the extent to which the evidentiary, cautionary, deterrent and channeling functions of form are met by the commercial setting or otherwise, and on the extent to which such other policies as the enforcement of bargains and the prevention of unjust enrichment are relevant."

Although the promise sought to be made the basis of an action in promissory estoppel need not be so definite that it would be sufficient as the basis for a contract action, the comment above indicates that its formality can be considered in making the equitable decision of whether it is a proper case for the application of the doctrine. The promises or "assurances" which the plaintiff claims to have relied upon here were rather informal. And actually the promise which the plaintiff seeks to enforce is not a promise to purchase and strengthen Milway, but an implied promise that the reduced debt would be paid in full—in essence a guarantee of payment. However, it could also be argued that the promise was that a good-faith effort would be made and that a guaranteed repayment was not actually expected. But since the defendant made no effort at all to strengthen Milway, there is no question as to whether the promise has been kept.

We can take into consideration the fact that all the parties involved in this transaction were businessmen. This is not a situation of an individual taken advantage of by a corporation or individual with superior knowledge of legal and business practices. The plaintiff was the brother of the major stockholder of Milway and had previously been associated with the business. There is nothing in the evidence which reveals that the plaintiff

could not have dealt directly with his brother and the prospective purchasers.

We conclude here to let the losses lie where they have fallen because it is not clear that injustice will result from nonenforcement of the alleged promises of the defendant.

### Did plaintiff establish a cause of action in promissory estoppel?

To establish a cause of action based on promissory estoppel the plaintiff must show that a promise was made to him which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character and that the promise did induce such action or forbearance. He has not carried this burden here.

The *Red Owl Case* established that the promise does not necessarily have to be made directly to the plaintiff. If the promise is made to one person and it is reasonably foreseeable that the promise will induce action or forbearance on the part of a third person, the promisor may be liable to such third person for nonperformance. In the *Red Owl Case* the defendant claimed that all its communications were made to the plaintiff husband and that no award of damages could be made to the plaintiff wife. This court allowed recovery of her damages because it was not only foreseeable that she would act in reliance but the defendant knew that as a joint owner of her husband's property she would have to join in any sale requested by the defendant.

The defendant here is arguing for a very limited application of the liability to third persons recognized in *Red Owl*. The defendant seems to argue that any dealings were between Nasco and Milway and that the plaintiff dealt with Milway, not Nasco, in reducing his claims against Milway. Therefore, defendant argues there can be no liability of Nasco to the plaintiff with whom it did

not deal or sign any agreements. However, if the alleged promises were made to agents of Milway and it was reasonably foreseeable that they would be repeated to the plaintiff and they induced plaintiff to reduce his claims against Milway, then this would be a proper case for liability to third persons. This is especially so where the defendant is alleged to have requested the very action that plaintiff took and had to be aware this request would be made known to the plaintiff. The Tentative Draft of sec. 90 for the Restatement of Contracts Second expressly recognizes that liability may exist to third persons.[5] However, the comment on this aspect of the doctrine makes it appear to have a limited application.

"c. *Reliance by third persons.* If a promise is made to one party for the benefit of another, it is often foreseeable that the beneficiary will rely on the promise. Enforcement of the promise in such cases rests on the same basis and depends on the same factors as in cases of reliance by the promisee. Justifiable reliance by third persons who are not beneficiaries is less likely, but may sometimes reinforce the claim of the promisee or beneficiary."

We can see no reason to limit recovery to those persons who would be considered third-party beneficiaries under contract law if this is what the proposed comment suggests. If the plaintiff can prove the essential facts he should not be precluded from recovery as a third party reasonably relying on promises made to others.

This leads to an analysis of the facts that the plaintiff did prove.

---

[5] Sec. 90 (1), Tentative Draft No. 2, *supra,* footnote 4, at page 215: "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. . . ."

(a) *The original letter of November 24, 1965.* This letter, if it contained promises which could be the basis for an action based on promissory estoppel, would be the type of promise to one party which it would be reasonably foreseeable would be communicated to another and cause action in reliance. The letter was addressed to Irv Silberman and was shown to Morry Silberman (except for one paragraph). The letter clearly suggested that Morry be asked about the possibility of reducing Milway's indebtedness to him. However, this letter did not contain any promises which could be the basis of an action. The letter clearly stated that the "offer" of purchase was subject to approval by the Nasco board of directors at their December 14, 1965, meeting. Thus the proposal was clearly tentative at that time. Also a careful reading of the letter does not reveal any representations of a promissory nature as to the strengthening of Milway by Nasco. The references in the letter are more accurately characterized as expressions of hope as to future financial success than promises to effect that success. Therefore, we conclude that any representations which can be the basis of liability must have come at a later time when it was apparent that an actual sale was to be consummated.

(b) *Subsequent negotiations after the December 14, 1965, meeting of Nasco's board of directors.* It is possible that promises were made by agents of Nasco with apparent authority to make such statements that Nasco was going to acquire Milway and strengthen it and put it on sound financial footing. Such statements could have been made by Burgess, Roethe, or Davis, to Irv Silberman. As the summary of testimony earlier shows, Irv Silberman testified that at the meetings he had with these persons there was never any question but that Nasco was going to acquire Milway, and that he never knew of any intention that the stock be acquired by

Burgess and Roethe. However, the deposition testimony does not establish any actual statements made by any agents of Nasco to Irv alone or in the presence of others. In fact, Irv testified in the deposition that he did not recall the question of the indebtedness to Morry being raised. The most Irv recalled was conversations in which Roethe spoke of the assets of Nasco. And in any case it is clear that Irv Silberman did not communicate with his brother Morry over the reduction of Milway's indebtedness. It is clearly established that Morry dealt through his attorney only with Milway's general counsel, Richard Van Deuren.

Richard Van Deuren was not called as a witness by either party to the present lawsuit. But it would have been more natural for the plaintiff to have called him to establish the plaintiff's case. Therefore, there is no direct evidence that Nasco, through its agents, made any representations to Van Deuren which it could expect would be passed on to the plaintiff, or that it directed Van Deuren to say anything in particular to the plaintiff. Both Attorney Marcuvitz and Attorney Klitsner were allowed to testify that Van Deuren told them Nasco was the purchaser and that Nasco would do various things and make various assurances. This would clearly be hearsay if offered to prove the facts stated. It could be admissible to show the plaintiff's state of mind and belief at the time of the reduction agreement. The plaintiff argues in his brief that indeed these statements were not hearsay being merely offered to show such statements were made. Counsel for the defendant objected to statements of Marcuvitz as to what Van Deuren had said and the trial court overruled the objections. Counsel did not again object when Attorney Klitsner testified as to conversations with Van Deuren. However, in light of the trial court's general overruling of defense counsel's objections, the failure to renew the objection

was not a waiver of objection to this type of testimony. There is also the fact that Davis, general counsel for Nasco, testified that he told Van Deuren the results of the Nasco board of directors' meeting and that Van Deuren was aware of the intention of Burgess and Roethe to acquire the Milway stock. This testimony is uncontradicted since Van Deuren was not called by the plaintiff to testify. There is no reason to find such testimony inherently improbable,[6] unless the fact that Irv Silberman's testimony that he knew nothing of the intention of Burgess and Roethe supports an inference that Van Deuren did not have such knowledge either and therefore discredits the statement.

If Van Deuren was an actual or apparent agent of Nasco, however, statements made by him would be admissible as admissions of his principal if they were made within the actual or apparent scope of his authority. It is clear that Van Deuren was not an actual agent of the defendant. He was at all times the general counsel of Milway and was known to Attorneys Marcuvitz and Klitsner as such.

The plaintiff urges that the evidence supports a finding that Van Deuren was the apparent agent of Nasco. The evidence does not support such a finding. This court has stated that to prove apparent agency three elements must be established: [7]

(1) Acts by the agent or principal justifying belief in the agency.

(2) Knowledge thereof by the party sought to be held.

---

[6] *Lopez v. Prestige Casualty Co.* (1971), 53 Wis. 2d 25, 191 N. W. 2d 908; *State v. Public Service Comm.* (1962), 16 Wis. 2d 231, 114 N. W. 2d 454; *Estate of Staniszewski* (1965), 28 Wis. 2d 403, 137 N. W. 2d 57.

[7] *Iowa National Mut. Ins. Co. v. Backens* (1971), 51 Wis. 2d 26, 34, 186 N. W. 2d 196.

(3) Reliance thereon by the plaintiff, consistent with ordinary care and prudence.

Attorney Marcuvitz testified that when he contacted Attorney Van Deuren, Van Deuren advised him that he was acting as the "middleman" between Morry Silberman and the prospective purchaser whom he identified as Nasco. Klitsner also testified that Van Deuren was involved as counsel for Milway and as a "go-between" on behalf of Nasco. This last testimony is a description by Klitsner rather than a repetition of any actual representations made to him by Van Deuren. This does not amount to a representation of agency by Van Deuren. Marcuvitz clearly testified on cross-examination that he knew Van Deuren was Milway's counsel at the time and was acting for Milway. As a "go-between" Van Deuren would be as much Morry Silberman's agent as an alleged agent for Nasco. Van Deuren was clearly the actual agent of Milway and it would be unethical for an attorney to represent or be the agent for both the seller, Milway, and the proposed purchaser.

The evidence does not show knowledge and acquiescence in any representations made by Van Deuren. The evidence does show that the terms of an agreement, acceptable to Burgess and Roethe, clearly were worked out through Van Deuren. Attorney Davis could not recall telephone conversations with Van Deuren but did remember being in Van Deuren's office when he was informed of what Morry Silberman would agree to. However, this is not sufficient to prove that the representations made by Van Deuren to Marcuvitz and Klitsner were directed by Nasco's agents or were known and approved by them. This would merely be an inference the plaintiff would like to draw—that the statements made by Van Deuren must have been represented to Van Deuren by agents of Nasco. Unless it can be established that Van Deuren was an

apparent agent, he should have been produced to give in-court testimony to establish that agents of Nasco did make representations to him which could reasonably be expected to have been passed on to the plaintiff, or that he was told to make various statements to the plaintiff. This was not done. We have only the testimony of Marcuvitz and Klitsner as to what Van Deuren told them Nasco would do.

And it would appear from what has been said previously that a belief that Van Deuren was an agent of Nasco would not be a reasonable belief on which to rely. Van Deuren was general counsel of Milway and was trying to work out a reduction of a debt owed to Morry in order to facilitate the sale of the company. Certainly it was reasonable to feel that he would tell them whether what they would agree to was acceptable to the proposed buyer. This does not make it reasonable to believe that Van Deuren was the agent of the proposed buyer.

(c) *The final reduction agreement.* The debt reduction agreement signed by the plaintiff and Milway, Inc., contained several "whereas" clauses indicating that because Nasco had indicated a willingness to acquire the outstanding stock of Milway and to sufficiently strengthen the company and put it on a sound financial footing, the plaintiff would agree to a reduction of his claim against Milway to insure such purchase. This document clearly corroborates the testimony of the plaintiff as to his beliefs at the time of the reduction and as to his reliance. However, Nasco is not a signatory to the agreement.

Attorney Davis testified that he read the document after it was signed by Morry Silberman as part of the closing papers to see if what had been negotiated was accomplished. This fact alone is not enough to establish liability on the part of Nasco. This situation is not analogous to an admission by silence and we know of

no duty on the part of Nasco through its general counsel, Davis, to enlighten the plaintiff when it realized that Morry Silberman apparently was under a mistaken impression as to the intent of Nasco.

We conclude, therefore, that as a matter of law the plaintiff did not meet his burden of establishing the first factor necessary to a promissory estoppel, to wit: "Was the promise one which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee?" [8]

Numerous questions are raised by defendant-appellant as to the verdict and instructions, but in view of our disposition of this case, it is unnecessary to reach these questions here.

*By the Court.*—Judgment reversed and cause remanded for further proceedings not inconsistent with this opinion.

---

[8] *Hoffman v. Red Owl Stores, Inc., supra,* footnote 1, at page 698.