GRUEN INDUSTRIES, INC., a Delaware Corporation, and Gruen Industries International, Inc., a Delaware Corporation, Plaintiffs-Appellants,

v.

Earl J. BILLER, Robert A. Hersch, and Premium Corporation of America, Inc., a Minnesota Corporation, Defendants-Appellees.

No. 78–2358.

United States Court of Appeals, Seventh Circuit.

Argued April 11, 1979.

Decided Oct. 30, 1979.

---

8. *E. g., Galler v. Galler,* 32 Ill.2d 16, 23–25, 203 N.E.2d 577 (1954). See 12 Fletcher, *op. cit.,* § 5461.6.

Robert A. Christensen, Milwaukee, Wis., for plaintiffs-appellants.

Bruce C. O'Neill, John J. Ottusch, Milwaukee, Wis., for defendants-appellees.

Before FAIRCHILD, Chief Judge, PELL, Circuit Judge, and BONSAL, Senior District Judge.*

PELL, Circuit Judge.

The plaintiffs, Gruen Industries, Inc. (Industries) and Gruen Industries International, Inc. (International) appeal from the entry of summary judgment in favor of the defendants Earl J. Biller, Robert A. Hersch, and Premium Corporation of America (PCA) on all three counts of plaintiffs' complaint. The first count of the complaint charged the defendants Biller and Hersch with breach of a contract to sell their shares in The Windsor Group, Inc. The second count against the same defendants alternatively sought recovery of expenditures based on promissory estoppel. The third charged the defendant PCA with tortious interference with the alleged sales contract between the plaintiffs and Biller and Hersch.

* Senior District Judge Dudley B. Bonsal of the Southern District of New York is sitting by designation.

At the time this action was filed the plaintiff Industries was a corporation engaged in the manufacture and sale of watches. The plaintiff International was its subsidiary. Each of the defendants Biller and Hersch owned 170,000 of the 400,000 outstanding shares in a company known as The Windsor Group, Inc. The remaining 60,000 shares were owned by 23 minority shareholders. The plaintiffs, represented by Charles Evans, the Vice President of Industries, approached Biller and Hersch in early 1975 to discuss a possible acquisition of Windsor. The plaintiffs allege that in early May 1975 Hersch and Biller orally agreed to a sale of Windsor's assets, and the record contains affidavits of Evans and Industries' board chairman Peyser to this effect. Evans has also indicated that he recorded the basic terms of the agreement in a memorandum shortly thereafter. The plaintiffs also allege that at the time of the oral agreement they informed Hersch that they would not incur the expenses for preparation of the written agreement unless he would assure them that they had a firm commitment, and Hersch assured them that they did. Again, the affidavits of Evans and Peyser support this allegation. The plaintiffs then retained lawyers and the drafting process began. On May 20, 1975, the sale was restructured, for the defendants' tax purposes, as a sale of shares by them and by certain minority shareholders, and the drafting process then continued. The date to sign the written agreement was set for the middle of July, and the unsigned draft agreement in the record sets the date for the sale and purchase of the shares as on or before November 1, 1975.

According to the plaintiffs, the drafting of the agreement was virtually complete by early July. The other defendant in this action, PCA, however, made a written proposal to purchase the shares for a higher price on July 17. The defendants sold their shares to PCA, and the written agreement with the plaintiffs was never signed.

The plaintiffs brought this action against Hersch, Biller, and PCA in October 1975. All three defendants moved for summary judgment. The district court granted the

defendants' motions, ruling that the alleged oral agreement to sell the shares was unenforceable against Biller and Hersch under the statute of frauds, Wis.Stat. § 408.319. Furthermore, the court ruled as to the promissory estoppel count, that the plaintiffs relied unreasonably on the promises of Hersch and therefore were not entitled to reimbursement for their costs. Finally, the district court reasoned that PCA was not liable for tortious interference with contract, because no enforceable contract existed. The plaintiffs challenge the rulings of the district court on all three counts, arguing that the court misapplied the law or, at the least, erred in granting summary judgment. We shall describe the relevant facts and arguments of the parties in greater detail as we discuss each issue.

### I. The Statute of Frauds

The plaintiffs' first theory of recovery against Biller and Hersch is based on breach of contract. The plaintiffs have outlined at some length in their brief the evidence of a contract in the record on summary judgment. The defendants successfully defended on the basis of the statute of frauds however, and the district court did not determine whether the parties had agreed orally on the terms and provisions of a contract.

The cornerstone of the defense is the statute of frauds which is applicable to sales of securities, section 8–319 of the Uniform Commercial Code, codified at Wis. Stat. § 408.319. The plaintiffs rely on only one subsection of the statute to rebut the defendants' argument that the oral contract alleged by the plaintiffs is unenforceable. Section 408.319(4) provides:

A contract for the sale of securities is not enforceable by way of action or defense unless:

\*  \*  \*  \*  \*  \*

(4) The party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract was made for sale of a stated quantity of

described securities at a defined or stated price.[1]

■ In their brief, the plaintiffs present seven statements which they argue are party admissions of a contract. We agree with the plaintiffs that an admission under section 408.319(4) need not expressly acknowledge the existence of a contract, nor need it describe all of its terms. *Dangerfield v. Markel,* 222 N.W.2d 373 (N.D. 1974) (applying the statute of frauds for sales of goods, section 2–201(3)(b) of the UCC). The admission need only describe conduct or circumstances from which the trier of fact can infer a contract. *Packwood Elevator Co. v. Heisdorffer,* 260 N.W.2d 543, 546 (Iowa 1977).[2] Whether the defendants' statements admit the existence of a contract is a question of fact. *Quad County Grain, Inc. v. Poe,* 202 N.W.2d 118, 120 (Iowa 1972). Thus, summary judgment should not be granted if there is a genuine issue whether the statements admit the existence of a contract. *See Spiering v. Fairmont Foods Inc.,* 424 F.2d 337, 340 (7th Cir. 1970).

The source of all but one of the statements relied on by the plaintiffs is a 193 page deposition of the defendant Hersch. Biller was never deposed, and the only statement actually made by Biller during this litigation appears in an affidavit in which he denies ever having made a contract with the plaintiffs. The plaintiffs have proceeded against Biller on the theory that Hersch is Biller's agent, and his admissions bind Biller for purposes of the statute of frauds. The independent evidence of this agency relationship is scanty, but for purposes of this discussion we shall assume, without deciding, that Hersch's statements bind Biller as well.

■ Three of the statements cited by the plaintiffs as admissions are so vague that it is difficult to attach any significance to them at all. The plaintiffs' brief offers little explanation of how a contract might be inferred from them, and we decline to speculate about their meaning.[3] *Cf. Alter & Sons, Inc. v. United Engineers & Constructors, Inc.,* 366 F.Supp. 959 (S.D.Ill.1973) (applying 2–201) (defendant admitted that they considered the transaction at issue a binding purchase order until he was ordered to cancel by third party; the plaintiff knew nothing about control of third party, however); *Kohlmeyer & Co. v. Bowen,* 126 Ga. App. 700, 192 S.E.2d 400 (1972) (applying 8–319) (defendant's answer admitted oral agreement to purchase $80,000 face amount of described bonds for a yield of 7.15% "when, as, and if issued").

1. Because some of the cases discussed hereinafter involved a sale of goods rather than securities, we note that the section of the Code dealing with the statute of frauds on sale of goods, Wis.Stat. § 402.201(3)(b), substantially tracks the language of § 408.319(4).

2. The article on investment securities, Article 8 of the UCC, contains no section on sales contract formation, and the plaintiff therefore relies by analogy on Wis.Stat. § 402.204, which sets forth an extremely flexible standard for the formation of contracts for the sale of goods:
    (1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.
    (2) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.
    (3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.
    *See also* § 402.207(3).

3. These statements appear in Mr. Hersch's deposition. Briefly summarized, these statements are:
    (1) "Mr. Peyser pulled his car up to our gate at LaGuardia, he helped us with the luggage . . . and I thanked him for his hospitality. We shook hands and he said that he was going to contact his law firm and I agreed that that would be fine."
    (2) Q [D]o you recall Mr. Evans departing on the final occasion . . . that you saw him off that he made a comment to the effect that, well it looks like everything is set?
    A He could have.
    Q Do you recall your response?
    A I probably said great.
    (3) Mr. Hersch conceded that he listened without objection while Evans discussed the "philosophy of the transaction" with the plaintiffs' bankers.

The other statements cited as admissions of a contract lead instead to the conclusion that the sellers manifestly did not intend to be bound until negotiations were complete and the documents signed. One of the statements relied on is Hersch's description of the meeting in early May during which Evans and Peyser allege the agreement to sell was reached:

> Q Was there some discussion at the time about the fact that Gruen was about to bring their Attorneys Cahill, Gordon & Reindel into the matter?
>
> A Mr. Peyser said to me, "Before we bring any professionals on the scene let's be sure that there is some basic philosophy that we can agree to" or words to that effect.
>
> \*     \*     \*     \*     \*     \*
>
> "Because the meter starts running when the lawyers step in." That's pretty much what he said.
>
> Q And what was your response?
>
> A My response was that if the professionals could put together a satisfactory deal to all parties we would be very interested.

Instead of admitting a contract, this statement sets forth briefly Hersch's and Biller's theory of defense that they did not intend to be bound until all negotiations were complete. Furthermore, we do not consider Hersch's statement that Evans' memorandum sets forth the "basic philosophy" of what they discussed at the early May meeting as creating a genuine issue of fact as to the existence of an admission. It is unrealistic to assert that complex[4] preliminary negotiations would take place without some general notion of the form of the transaction. Being "interested" falls far short of any expression of a statutorily-required admission "that a contract was made for sale of a stated quantity of described securities at a defined or stated price." The crucial showing that Hersch *bound* himself during this meeting, in sum, is not made by this statement.

■ The plaintiffs also argue that statements of Hersch and of his attorney describe certain conduct sufficient to show agreement, and thus admit a contract. *See* Wis.Stat. § 402.204 (quoted in n. 2 *supra*). Hersch's statement admits to advancing $2,000 on behalf of the plaintiffs to secure financing, because one of the defendants' lenders declared that it would not consent to a sale to Gruen and would have to be paid off. Hersch's attorney in his deposition testified that some of the materials described in the schedules of the unsigned written agreement were delivered to the plaintiffs' attorneys in mid-July.[5] A reading of the transcript of these statements, however, shows nothing more than ongoing negotiations,[6] because the conduct was ac-

---

4. The complexity and ramifications of the potential transaction are demonstrated by the fact that when the lawyers did finish the work of producing a draft, which was never executed, it was 58 pages in length.

5. The defendants challenge a statement by the attorney as not being an admission by a party under the statute. While the lawyer's statement appears to be beyond the plain language of the statute, and may well be beyond what is probably a statutory purpose of ascertaining whether a charged party really regarded himself as being bound by a contract, we, as in the case of Biller, without deciding the matter, have considered the attorney's statement.

6. Hersch's statement was:

> Q Well, tell me everything you can recall about the conversation concerning the payment of the $2,000 binder?
>
> A The only way that we could get a firm commitment from Capital Investments [the new lender] was to submit a $2,000 check to them and Charlie [Evans] insisted that I do it promptly and he obviously must have said to me, I'll pay you back, and I did it.
>
> Q So that you . . . issued a check to Capital Investments in the sum of $2,000 as a binder on their financing?
>
> A That is correct. If I remember correctly, the $2,000 was to be reimbursed out of the first month's interest if we closed and I also believe that the closing was set for the 15th of July but it never happened.

Hersch's attorney's statement described the delivery as follows:

> " . . . In other words, when I—when I delivered the schedules, as I said, it was with a general caveat that here they are. I haven't proofread them or reviewed them with the company. Take them for what they are worth and I think, well, you know, no one

companied by statements making it clear that there was no agreement until the negotiations were complete.

■ It is well settled that no contract is formed "where two parties consider the details of a proposed agreement, perhaps settling them one by one, with the understanding during this process that the agreement is to be embodied in a formal written document and that neither party is to be bound until he executes the document." 1 A. Corbin, Contracts § 30 at 97 (1973 ed.). *See Luria Bros. & Co. v. Pielet Bros. Scrap Iron & Metal, Inc.*, 600 F.2d 103, 108 (7th Cir. 1979); *Lambert Corp. v. Evans*, 575 F.2d 132, 135 (7th Cir. 1978). We hold that the statements of the defendants have raised no genuine issue of the existence of a contract under § 408.319(4) and that the district court therefore properly entered summary judgment against the plaintiffs on their contract claim.

## II. *Promissory Estoppel*

The plaintiffs' second theory of recovery against Hersch and Biller is based on promissory estoppel. The plaintiffs seek to recover various preparation expenses incurred, comprising primarily substantial attorneys' fees for drafting the agreement and supplemental documents. As the basis for this theory of recovery the plaintiff has alleged that the defendants orally assured them that they had a firm commitment and then consented to the plaintiffs' procuring legal counsel for the purpose of drafting the necessary documents.[7]

■ In *Hoffman v. Red Owl Stores, Inc.*, 26 Wis.2d 683, 133 N.W.2d 267 (1965), the Wisconsin Supreme Court established three conditions for application of promissory estoppel:

(1) Was the promise one which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee?
(2) Did the promise induce such action or forbearance?
(3) Can injustice be avoided only by enforcement of the promise?

The first two conditions present questions of fact; the third presents a policy question for the court to decide, and necessarily embraces an element of discretion. *Id.*, 26 Wis.2d at 698; 133 N.W.2d at 275.

More recently, in *Silberman v. Roethe*, 64 Wis.2d 131, 218 N.W.2d 723 (1974), the Wisconsin Supreme Court discussed in detail for the first time the factors to be considered by the trial court in deciding whether a plaintiff has satisfied the third condition. The factor receiving primary consideration in *Silberman* was the certainty "that the plaintiff has actually suffered from his action in reliance." In *Silberman* the plaintiff reduced a debt owed to him by a corporation in reliance on a promise by the defendant to purchase the corporation and to strengthen it financially. The defendant did not keep its promise, and the corporation failed. Nevertheless, the plaintiff did not prevail against the defendant because it was speculative that the plaintiff ever could have collected the full debt had it tried.

■ Similarly, the alleged agreement here was subject to numerous conditions, some of which were under the control of third parties. If any of these conditions were not satisfied, the buyers or sellers would have been able to terminate the agreement unilaterally prior to the sale and purchase of the stock.[8] Had the defendants

---

had signed off on them either from the company since I hadn't reviewed them with Mr. Biller and Mr. Hersch."

7. As we held above, the defendants have never admitted directly or indirectly to having made these promises, but we shall assume the truth of these allegations for the purpose of determining this issue.

8. If the Windsor Group net worth dropped below a certain amount of its June 30, 1975 bal-

ance sheet, for example, the agreement provided that "either the Buyer and/or Biller and/or Hersch may elect in writing not to proceed with the Closing, [defined as the actual sale and purchase] and the Agreement shall terminate and be of no further force and effect." As a condition to the obligation of International and Industries to close, at least 75% of the outstanding shares held by 23 minority shareholders in The Windsor Group had to be sold. Furthermore, all encumbrances on the defend-

kept the alleged promises, as they are embodied in the unsigned Agreement, the sale may very well have failed on the basis of the many contingencies, and the plaintiffs would not have been entitled to any reimbursement of their expenses. We agree with the district court that summary judgment is appropriate here. To avoid injustice, it clearly is not necessary that plaintiffs be placed in a better position for the alleged breach than they may have been had the promise been kept. The conditional promise alleged is not a reasonable basis for reliance and thus not a proper basis for estoppel. See *Winnebago Homes, Inc. v. Sheldon,* 29 Wis.2d 692, 139 N.W.2d 606 (1966); Restatement of Contracts (Second) § 90, Comment b (Tent.Draft No. 2, 1965) (quoted in *Silberman, supra,* 64 Wis.2d at 145–46, 218 N.W.2d at 730).[9]

In addition to the conditional nature of the promise, other circumstances of this case militate against recovery on an estoppel theory. The alleged promises were made informally; indeed even under the plaintiffs' theory of the case, the written Agreement was intended as a formal and more detailed record of the agreement of the parties. See *Silberman, supra,* 64 Wis.2d at 146, 218 N.W.2d at 730. Further-

more, the plaintiffs were represented by sophisticated businessmen,[10] and therefore "[t]his is not a situation of an individual taken advantage of by a corporation or individual with superior knowledge of legal and business practices." *Id.* Finally, there is no allegation that the defendants were in any way unjustly enriched because of the plaintiffs' reliance. In fact, the defendants also retained attorneys in connection with the preparation of the agreement and no doubt paid a substantial sum for their services.

Finally, we note that in its Reply Brief, the plaintiff cites Restatement of Contracts § 91, which provides:

> If a promise within the terms of §§ 86–90 is in terms conditional or performable at a future time the promissor is bound thereby, but performance becomes due only upon the happening of the condition
> .   .   . .

This section is applicable to the remedy in estoppel, not to the situation before us. The issue presented here is whether the promise comes within the terms of section 90 of the Restatement, as adopted by the Wisconsin Supreme Court in the *Red Owl* decision. Section 91 is relevant only after it has been established that the promise satis-

---

ants' stock had to be discharged. As a condition to the sellers' obligation to close, International's shares had to be fully owned by Industries, free of any encumbrances not contemplated by the Agreement.

We have referred only to a few of the aspects demonstrating the far from complete nature of the dealings between the parties and do not deem it necessary to prolong this opinion by referring to the numerous other aspects cited by the defendant to the same effect.

The plaintiffs argue that they could have waived the many conditions running to their benefit, but this argument does not apply to the issue before us. We must instead determine whether it was likely that the plaintiff *would* have done so, not whether they *could* have done so. See *Silberman, supra,* 64 Wis.2d at 144, 218 N.W.2d at 729. Certainly their lawyers thought the conditions were significant enough to be included in the lengthy unsigned draft of a contract.

**9.** In *Winnebago,* the plaintiff builder sought recovery from the defendant mortgage lender

which promised payment upon completion of a dwelling. In reliance on the promise, the plaintiff finished the project. The lender, however, failed to pay because FHA insurance was not obtained. The Wisconsin Supreme Court held that

> [t]he construction company either knew or should have known that the disbursement of the funds by the lender was conditioned upon the FHA's insuring this loan. We think it unrealistic to hold, as the appellant proposes, that [the defendant] estopped itself from refusing to make payment to the builder even though FHA insurance was not ultimately procured. This is particularly true since the failure to obtain FHA insurance was not through the action or inaction of the lender.

29 Wis.2d at 701, 139 N.W.2d at 610.

**10.** Peyser graduated from Williams College in 1950 and is an experienced investment banker. Evans graduated from Cornell Law School in 1952 and has been an attorney and business executive ever since.

fies the *Red Owl* test, despite its conditional nature.

In summary, the plaintiffs' promissory estoppel argument seeks to transform these complex negotiations into a "no lose" situation. Every businessman faces the risk that the substantial transaction costs necessary to bring about a mutually beneficial contract will be lost if the negotiations fail to yield a satisfactory agreement. It is difficult to find the degree of injustice necessary for recovery in estoppel when the promises incorporate so many contingencies and complexities and as a matter of sound business practice are to be formalized before the parties carry them out. We conclude on this basis that the losses are best left where they have fallen, because it is clear that no injustice will result from not enforcing the alleged promise.

### III.   *Tortious Interference*

The plaintiffs' third and final cause of action charges the other defendant, PCA, with inducing a breach of contract by Biller and Hersch. The district court granted summary judgment in favor of PCA, reasoning that Wisconsin law grants no remedy for interference with a contract which is unenforceable under the statute of frauds. We have already held that if a contract existed, it was unenforceable, but we query whether the Wisconsin courts would permit PCA, a third party, to benefit from the statute of frauds defense available to Biller and Hersch. *See* Wis.Stat. § 402.201, Comment 4 (sales statute of frauds not a defense for use by third parties); *Bitzke v. Folger,* 231 Wis. 513, 286 N.W. 36 (1939). Nevertheless, we hold here that summary judgment was proper because, even if there was a contract, the plaintiff has not submitted sufficient evidence to create a factual question on the issue of intent.

To recover for interference with contract under Wisconsin law, it is essential that the defendant act intentionally. To have the requisite intent, the defendant must act with a purpose to interfere with the contract. Thus,

> [I]f the actor does not have this purpose, his conduct does not subject him to liability under this rule even if it has the unintended effect of deterring the third person from dealing with the other.

*Augustine v. Anti-Defamation League,* 75 Wis.2d 207, 219, 249 N.W.2d 547, 553 (quoting Restatement of Torts § 766, Comment d (1939)). To show that a defendant had the requisite intent to interfere, it is necessary to show that he had actual knowledge or sufficient notice of the existence of a contract. *Sweeney v. Stenjem,* 271 Wis. 497, 74 N.W.2d 174 (1956); *E. L. Husting Co. v. Coca-Cola Co.,* 205 Wis. 356, 237 N.W. 85 (1931).

According to the plaintiff, the following evidence of notice is sufficient to withstand summary judgment on the issue of intent:

1) According to the defendant Hersch's "Chronological Series of Events," PCA was informed on July 9 that K–Promotions was "in the final stages of negotiating an agreement for sale of our stock to a New York listed company." PCA was told to contact Hersch for details.

2) An affidavit of Edwin Gage, a vice president of PCA, says that he was told by Hersch that "he was negotiating the sale of the stock  .  .  .  and that if [PCA was] interested it must act quickly in making an offer as the negotiations with another were proceeding." Gage asked Hersch "if there was still time .  . to submit an offer and was told that an offer could be submitted if I acted quickly."

3) According to both Hersch and Gage, PCA learned on July 10 that the plaintiff was the buyer involved, and according to Hersch, that the "arrangement  .  .  . was being finalized and that a closing was planned" for July 16.

4) On July 17 when Gage submitted a written proposal, he was told "by John Cahill, the attorney for  .  .  . Hersch, in the presence of  .  .  . Hersch, Biller and other individuals involved in the management of The Windsor Group  .  .  .  that no agreement had been made with Gruen International and that the board of directors  .  .  . would consider the proposal  .  .  . .

5) Hersch and Biller accepted the offer by telephone on July 20 and requested Gage to reduce his "offer to the necessary documentation."

This evidence shows, and the plaintiff does not argue otherwise, that PCA had no actual knowledge of a contract. The Wisconsin Supreme Court, however, has held at least once that intentional interference occurred in the absence of actual knowledge that a valid contract existed. In *Sweeney v. Stenjem,* 271 Wis. 497, 74 N.W.2d 174 (1956), the defendant was told that the seller had a contract with the plaintiff, that the contract was conditioned upon the property being rezoned, and that the property had been rezoned, although not in accordance with the contract. The Wisconsin Supreme Court held that

> [t]he very fact that the vendor and his attorney had informed defendant that Sweeney's contract had been terminated constituted notice of the existence of such a contract, and it was incumbent upon him to make such inquiry as would apprize him of the true facts.

271 Wis. at 503, 74 N.W.2d at 177. The notice given to the defendant in *Sweeney,* however, is only technically different from an unambiguous statement that a contract existed. The defendant here was told merely that a sale was being negotiated and that an agreement had not yet been reached with the plaintiffs. The defendant argues, and we agree, that *Sweeney* says merely that a defendant with *actual* knowledge of a *prior* contractual relationship cannot rely on information that the contract was breached or terminated to avoid an action for intentional interference. We decline to dilute the intent requirement of this tort by imposing an affirmative duty of inquiry on the part of a potential purchaser whenever it has knowledge of slight circumstantial evidence of a contract with a competitor. The Wisconsin decisions have not expanded liability this far, no doubt partly because the creation of such a duty of inquiry could give parties considerable power to intimidate their competition, even in the absence of a valid contract.[11]

Having concluded that the absence of knowledge of a contract precludes liability on the part of the defendant for tortious interference with contract, we add briefly that the defendant PCA similarly is not liable on any other noncontractual theory of business interference, because PCA clearly was protected by the competitor's privilege. *See National Oil Co. v. Phillips Petroleum Co.,* 265 F.Supp. 320 (W.D.Wis.1966).

For the above reasons the judgment of the district court is affirmed.

---

11. *Pure Milk Products Coop. v. National Farmers Organization,* 64 Wis.2d 241, 219 N.W.2d 564 (1974), and *Neillsville Shipping Ass'n v. Lastofka,* 225 Wis. 350, 274 N.W. 280 (1937), cited by the plaintiff, concededly find tortious interference in the absence of actual knowledge. These cases involve constructive knowledge, however, and are unpersuasive because they apply Wisconsin statutes creating a recording system to protect the prior contract rights of agricultural cooperatives. *E. L. Husting Co. v. Coca-Cola Co.,* 205 Wis. 356, 237 N.W. 85 (1931), also relied on by the plaintiff, is factually very similar to *Sweeney,* discussed *supra,* and does not compel a different result. In fact, in *Husting* the defendant not only knew of the prior contract, but also knew that the plaintiff still asserted that it was in effect.