BREVIG, and another, Plaintiffs, v. WEBSTER, and wife, Defendants-Appellants: MATTIE, Defendant-Respondent.

Court of Appeals

*No. 77–660. Submitted on briefs October 10, 1978.—Decided February 15, 1979.*
(Also reported in 277 N.W.2d 321.)

For the defendants-appellants the cause was submitted on the briefs of *Moen, Sheehan, Meyer & Henke, Ltd.,* with *Michael S. Moen* of counsel, of La Crosse.

For the defendant-respondent, the cause was submitted on the brief of *Steele, Klos & Flynn-Chartered,* with *G. Jeffrey George* of counsel, of La Crosse.

Before Gartzke, P.J., Bablitch, J. and Dykman, J.

BABLITCH, J.    This is an appeal from a judgment of the circuit court for La Crosse County in an action involving a dispute over the ownership of three parcels of land near the south shore of Lake Neshonoc.

Appellants George and Barbara Webster claim title under deeds executed in 1971. Respondent Donald Mattie claims title under oral land contracts preceding the Webster deeds and under a 1974 deed allegedly executed pursuant to those contracts.

The facts are complex, though not in serious dispute. The plaintiffs Melford and Marjorie Brevig were owners

of a farm in La Crosse County on which the three disputed parcels were located. In or about 1953, Mattie received the Brevigs' permission to camp on a part of this land. In 1955, he approached Melford Brevig to inquire whether he could purchase a lot in the area where he had been camping. Mr. Brevig told Mattie to choose a specific lot, and to arrange for a survey. Mattie cleared brush and stumps from an area approximately 98 feet by 204 feet. In or about 1956, one or both parties hired a surveyor to provide a legal description for the lot. At trial this lot was designated as "parcel one," and will be referred to as such in the balance of this opinion.[1]

No written contract was ever executed by the parties. On January 2, 1960, Mattie signed a promissory note in the amount of $1,000, payable to the Brevigs with interest at five percent per annum, and due on January 2, 1966. Both Mattie and the Brevigs testified at trial that this note represented the purchase price of parcel one. Mattie made payments on the note from time to time thereafter, as he could afford it. The final payment was not made until December 31, 1970. The Brevigs testified at trial that the payment schedule was flexible, and that they did not object to the late payments.

In 1965, Melford Brevig agreed to convey a small lot to the north of, and contiguous to parcel one at no additional cost if Mattie would fill and maintain a ditch on the parcel so as to prevent runoff onto Brevigs' adjacent fields. This lot is referred to as "parcel two," or the "ditch parcel." Mattie subsequently filled and sodded this parcel and has maintained it continuously since 1965.

In 1959, the Brevigs conveyed by warranty deed a lot north of an contiguous to the ditch parcel to Eugene Huffman, and simultaneously granted Huffman an oral option to purchase a slightly smaller parcel north of and

[1] A copy of a survey map made in 1965, and referred to in later parts of the opinion, is appended.

contiguous to the "Huffman parcel." The parcel on which the option was given is referred to as "parcel three." In 1962 Mattie purchased the Huffman parcel for an undisclosed price, and obtained a warranty deed which was subsequently recorded. There is no dispute as to his ownership of that parcel. He testified that as a part of that transaction he also acquired the oral option to purchase parcel three from the Brevigs at a purchase price of $500. Melford Brevig corroborated this testimony. Mattie also testified that he would not have purchased the Huffman parcel without a guarantee that he could purchase parcel three thereafter. No time limit was placed on the exercise of this option. No part of the agreed-upon price had been paid at the time of trial.

Subsequent to each oral agreement, Mattie made certain improvements on each of the four parcels. He maintained a mobile home on parcel one, was instrumental in obtaining an electrical highwire and telephone service to the area, drove a well, erected a pole barn, and established and maintained a cinder road into parcel one. He also cultivated and seeded parcels two and three, kept parcel three mowed and "looking like a yard," and erected a flag pole and planted flowers on it.

In 1965, the Brevigs negotiated the sale of their farm to one Rhyme. Though this deal later fell through, during the course of the negotiations the Brevigs hired a surveyor to identify the four parcels. A copy of the survey map prepared under Melford Brevig's direction was admitted into evidence. The lots referred to in this action as parcel one and the Huffman parcel bear the surveyor's handwritten inscription, "D. Mattie." The parcels referred to in this action as parcels two and three are inscribed on the survey map as "#2" and "#3," respectively.

In 1967 the Brevigs sold a small lake lot to defendant George Webster. In 1969, Webster expressed his interest

in buying the entire Brevig farm. The Brevigs and Webster had periodic negotiations concerning the proposed sale from 1969 through the spring of 1971. The Brevigs testified that during the course of these negotiations they showed Webster a copy of the 1965 survey and explained repeatedly that the parcels of land discussed above were being purchased by Mattie and would have to be excepted from the sale to Webster. Webster admitted seeing the survey and being told on one occasion that the Mattie parcels must be excepted, but testified that he insisted they be conveyed to him, and that the Brevigs did not mention the exclusion as a condition of, the sale during the later stages of the negotiations. The Brevigs denied that Webster insisted on the transfer of these parcels as a condition of sale.

On April 24, 1971, four months after Mattie completed payments on parcels one and two, the Brevigs and Webster entered into a written real estate and personal property sales agreement. On June 8, 1971, the Brevigs executed a warranty deed to Webster, and on June 21, 1971, they executed a quit claim deed to substantially the same property.[2] All three documents failed to except parcels one, two, three, and the Huffman parcel, though they did except a lot the Brevigs intended to retain as their home. The purchase contract was prepared by Webster's attorney. The deeds were prepared through the joint efforts of the parties' respective attorneys over a period of several days. The Brevigs testified that they instructed their attorney to exclude all four "Mattie parcels," as well as their homestead, and that they assumed he had done so at the time they executed the sales contract and the deeds. Webster testified that he as-

---

[2] The legal description of the lands conveyed in the two deeds varied slightly because of boundary discrepancies relating to other portions of the farm. These discrepancies are not material to this action. Both conveyances included parcels one, two, three, and the Huffman parcel.

sumed they had withdrawn their insistence that the parcels be excepted when he received deeds which failed to exclude them.

After the sale to Webster, he made no attempt to prevent Mattie from tending or otherwise exercising a proprietary interest in any of the four parcels. Nor did he make any overt claim of ownership to these parcels. In early 1972, Mattie approached Webster to explore the possibility of negotiating a deal to straighten the road running along the eastern portion of the four parcels.[3] Accordingly, Webster contacted a surveyor to stake out a new road. The staking out was accomplished by the cooperative efforts of Webster, Mattie, and the surveyor in or about April of 1972. As a result of the survey, the eastern boundaries of the four parcels were extended by approximately six feet into Webster's property. Mattie testified that at no time did Webster say anything indicating a belief that Webster owned the parcels. Mattie also testified that he had told Webster he was "a hell of a swell fella" to give Mattie six feet of land. The surveyor testified that Webster told him the purpose of the survey was to straighten out "Mattie's line" and to make a better road.

Sometime in 1974, Mattie contracted to sell the property to a third party.[4] During the course of the buyer's title search, Mattie discovered that the parcels had never been "registered" in his name as he believed had been done at the time of the Brevig-Webster sale. Mattie con-

---

[3] Mattie's testimony was less than precise about the timing of this conversation. Our assumption that it occurred in the early part of 1972 is based on the surveyor's testimony that the survey was performed in April of that year.

[4] The testimony was unclear as to the date of this contract. Since the contract prompted the September 4, 1974 warranty deed from the Brevigs to Mattie, we assume it was made during that year.

tacted Melford Brevig, and thereafter the Brevigs executed a warranty deed dated September 4, 1974, conveying all four parcels of land to Mattie. Mattie's attorney contacted Webster, who refused to execute a quit claim deed of these parcels to Mattie.

The Brevigs commenced this action in January, 1976, seeking reformation of the 1971 Webster deeds to exclude the parcels claimed by Mattie. The Websters cross-claimed to quiet title of the entire land in themselves. Mattie cross-claimed for reformation. The Brevigs' complaint was dismissed for reasons immaterial to the issues on appeal and the matter was tried on the cross-claims. The Websters appeal from a judgment confirming Mattie's title in parcels one and two and granting him 30 days from the entry of judgment to pay the Brevigs the $500 purchase price on parcel three.

The issues are:

I. Whether the trial court erred in admitting parol evidence of the oral contracts between Mattie and the Brevigs.

II. Whether the oral contracts are enforceable under the equitable exceptions to the statute of frauds.

## I.

### PAROL EVIDENCE

■

Webster made numerous objections during the course of the trial to testimony concerning the oral agreements between Mattie and the Brevigs, contending that such evidence was barred by the parol evidence rule. This rule excludes parol evidence to alter or vary the terms of contracts reduced to writings intended to embody the

final expression of an agreement between parties. *Fed. Deposit Ins. Corp. v. First Mortg. Investors,* 76 Wis.2d 151, 156, 250 N.W.2d 362 (1977). However, parol evidence is always admissible to determine whether the parties intended a writing to be a final and complete expression of their agreement. 76 Wis.2d 151, 158; *Bunbury v. Krauss,* 41 Wis.2d 522, 531, 164 N.W.2d 473 (1969).

In *Bunbury,* 41 Wis.2d 522, 529, the court noted that "the parol evidence rule . . . implies the existence of a written contract expressing the intent of the parties without any question of fraud or mistake, and to which the parties assent as a complete integration of their understanding." The court quoted with approval 3 Corbin, *Contracts* sec. 573, at 357 (1960), to the effect that in determining whether a contract has been entered into " 'there is no "parole evidence rule" to be applied.' " On this issue, " 'no relevant evidence, whether parol or otherwise, is excluded.' " 41 Wis.2d 522, 529, citing 3 Corbin at 359–60.

In the instant case, no written contract existed as to any of the three disputed parcels, and the trial court properly admitted the note, the surveys, and testimony concerning the intent of Mattie and the Brevigs to form a contract as to each parcel. At most, the promissory note and the survey of 1956 constituted an incomplete "integration" of the parties' intent with respect to parcel one. There was no written expression of their intentions as to parcels two and three. Consequently, parol evidence was necessary and appropriate to determine whether a contract existed for any of the parcels and the precise terms of each.

## II.

## STATUTE OF FRAUDS

Under the Wisconsin statute of frauds, a contract to convey land is not valid unless it is set forth in a writing which identifies the parties, the land, and the interest to be conveyed, and which is signed by the parties to the transaction. Sec. 706.02, Stats.[5] Section 706.04, Stats.,[6] provides for equitable relief from the statute of

---

[5] Sec. 706.02, Stats., **Formal requisites.**

(1) Transactions under s. 706.01(1) shall not be valid unless evidenced by a conveyance which:

  (a) Identifies the parties; and

  (b) Identifies the land; and

  (c) Identifies the interest conveyed, and any material term, condition, reservation, exception or contingency upon which the interest is to arise, continue or be extinguished, limited or encumbered; and

  (d) Is signed by or on behalf of each of the grantors; and

  (e) Is signed by or on behalf of all parties, if a lease or contract to convey; and

  (f) Is signed, or joined in by separate conveyance, by or on behalf of each spouse, if the conveyance alienates any interest of a married person in a homestead under s. 706.01(7) except conveyances between spouses . . . .

[6] Sec. 706.04, Stats., **Equitable relief.**

A transaction which does not satisfy one or more of the requirements of s. 706.02 may be enforceable in whole or in part under doctrines of equity, provided all of the elements of the transaction are clearly and satisfactorily proved and, in addition:

(1) The deficiency of the conveyance may be supplied by reformation in equity; or

(2) The party against whom enforcement is sought would be unjustly enriched if enforcement of the transaction were denied; or

(3) The party against whom enforcement is sought is equitably estopped from asserting the deficiency. A party may be so estopped

frauds in certain circumstances. The threshold question in determining if Mattie is entitled to the reformation of the Webster deeds demanded in this action is whether the terms of the oral contracts under which he claims title were "clearly and satisfactorily proved" under sec. 706.04. We have no hesitation in sustaining the trial court's findings that a contract to convey was established as to each of the three parcels.

With respect to parcels one and two, the contracts had been fully performed by Mattie at the time he made the final payment on the promissory note. All that remained was for the Brevigs to deliver a deed. Though it is not clear from the record why no deed to these parcels was given at the time the final payment was made, the testimony supports an inference that the parties intended to accomplish the conveyance of parcels one, two, and three in one deed after Mattie paid for parcel three.

The only uncertain term of the contract relating to parcel three was the time of payment. The parties to the transaction, the price, and the interest to be conveyed were all established by the uncontroverted testimony of the Brevigs and Mattie. The boundaries of the land were shown on the 1965 survey and confirmed by the surveys which were made in later years. The failure of a contract to specify a time for performance does not render the contract void. "The legal implication is

whenever, pursuant to the transaction and in good faith reliance thereon, the party claiming estoppel has changed his position to his substantial detriment under circumstances such that the detriment so incurred may not be effectively recovered otherwise than by enforcement of the transaction, and either:

(a) The grantee has been admitted into substantial possession or use of the premises or has been permitted to retain such possession or use after termination of a prior right thereto; or

(b) The detriment so incurred was incurred with the prior knowing consent or approval of the party sought to be estopped.

that performance is to take place within a reasonable time." *Inglis v. Fohey,* 136 Wis. 28, 33, 116 N.W. 857 (1908). *See also American Metal P. Co. v. A. Geo. Schultz Co.,* 221 Wis. 291, 298–99, 267 N.W. 19 (1936). Though both cases just cited relate to written contracts, we see no reason why the rule should be otherwise with respect to oral contracts. In the recent case of *In Matter of Estate of Lade,* 82 Wis.2d 80, 84, 260 N.W.2d 665 (1978), the Wisconsin Supreme Court found that an oral contract to convey, rather than an option to purchase, had been created by an agreement to sell at a price certain, despite the parties' failure to specify a date for performance. Here, it is clear from their actions that both parties believed Mattie had exercised the option soon after he obtained it in 1962, and that he fully intended to pay the agreed upon purchase price "when he could afford it."

Mattie's failure to tender payment for parcel three, or the Brevigs' failure to demand it between 1962 and the time of trial, does not automatically imply that an unreasonable amount of time had passed disentitling Mattie to specific performance of the agreement. The Brevigs testified that they were "in no hurry" for the money. Their course of conduct in accepting late payments on parcels one and two supports this testimony. It is not for the court to impose its notion of a "reasonable" time on parties to a private contract who have demonstrated by their conduct what is reasonable between them.

Once the terms of an oral transaction have been proved pursuant to sec. 706.04, Stats., the question becomes whether it may be enforced pursuant to any of the subsections of that statute. These subsections codify familiar equitable principles enunciated in Wisconsin case law. Subsection (2) of the statute provides that a contract which does not satisfy the requirements of sec. 706.02,

Stats., may be enforced if "[t]he party against whom enforcement is sought would be unjustly enriched if enforcement of the transaction were denied." *See Stuesser v. Ebel,* 19 Wis.2d 591, 597–98, 120 N.W.2d 679 (1963), and the Committee Comment to ch. 285, sec. 23, Laws of 1969, which created the statute on equitable relief.

Section 706.04(3), Stats., allows enforcement if that party is "equitably estopped from asserting the deficiency." The statute provides:

... A party may be so estopped whenever, pursuant to the transaction and in good faith reliance thereon, the party claiming estoppel has changed his position to his substantial detriment under circumstances such that the detriment so incurred may not be effectively recovered otherwise than by enforcement of the transaction, *and either:*

(a) The grantee has been admitted into substantial possession or use of the premises or has been permitted to retain such possession or use after termination of a prior right thereto; *or*

(b) The detriment so incurred was incurred with the prior knowing consent or approval of the party sought to be estopped. (Emphasis added.)

This subsection codifies the related doctrines of part performance and equitable estoppel. *See Clay v. Bradley,* 74 Wis.2d 153, 158, 246 N.W.2d 142 (1976), and *Bunbury v. Krauss,* 41 Wis.2d 522, 536, 164 N.W.2d 473 (1969).[7]

[7] In *Bunbury,* 41 Wis.2d 522, 536, the court quoted with approval a section from 2 Corbin, *Contracts* sec. 422A (1950 & Supp. 1964), explaining the close relationship between part performance and estoppel.

"There are a good many cases in which the court says that by reason of the plaintiff's 'part performance' the defendant is 'estopped' from setting up the statute of frauds. Although the doctrine of 'estoppel' had an origin quite different from that of 'part performance,' the term has no such narrow usage or definition as to prevent its use here .... The 'part performance' doctrine is used by the courts in order to compel a party to perform in accordance with an oral contract that is within the provisions

The trial court did not cite specific statutory authority for its holding, but relied instead on *Bunbury v. Krauss, supra,* and *Bump v. Dahl,* 26 Wis.2d 607, 133 N.W.2d 295 (1965), two cases decided prior to the effective date of sec. 706.04, Stats. It found substantial part performance by Mattie in reliance on the oral contracts; that damages would not be an adequate remedy; that Webster had actual notice of Mattie's interest in the parcels and was not a purchaser in good faith of those parcels; and that it would be unjust and inequitable to allow either the Brevigs or Websters to assert any position contrary to the completion of the oral contracts between the Brevigs and Mattie. We find ample support in the record for each of the trial court's findings. We hold that Mattie is entitled to the relief granted by the trial court under both common law and statutory standards.

Webster accurately asserts that acts of partial performance sufficient to relieve a party from the requirements of the statute of frauds must be "exclusively referable" to the contract sought to be enforced, and in reliance on it. *In Matter of Estate of Lade,* 82 Wis.2d 80, 86, 260 N.W.2d 665 (1978); *Toulon v. Nagle,* 67 Wis. 2d 233, 248, 226 N.W.2d 480 (1975); *Bunbury v. Krauss,* 41 Wis.2d 522, 534. The record shows that Mattie made substantial improvements to parcels one and two, both of which had been previously wild and unused. He did so by his own labor and with help hired at his own expense, over a period of many years. During some of

of the statute of frauds. But legal terms do not start with a definition; and when some jurist constructs a definition the courts and the lawyers never strictly adhere to it. This is especially apparent in the case of 'estoppel.' It is now a very loosely used term in the process of doing justice, whether because of untrue representations or of broken promises. The case is exactly the same with the term 'part performance.' "

those years, he was also making payments towards the purchase price of these parcels. Taken together, these acts unequivocally demonstrate a proprietary investment of time, effort, and money exclusively referable to the oral contracts of sale.

Mattie's acts of improvement to parcel three are not unequivocal. However, his testimony that he would not have purchased the Huffman parcel without the option to purchase parcel three is undisputed. His sodding, mowing, and tending of parcel three, together with his purchase of the Huffman land, were acts of detrimental reliance on the oral agreement relating to parcel three, and were exclusively referable to that agreement.

We concur with the trial court's conclusion that Mattie's investment of time, labor, and money in all three of the parcels could not be compensated by the payment of money damages, nor by any remedy other than specific performance of the contracts which induced those investments. Since Mattie's acts of reliance on all three oral contracts were performed after Mattie had "been admitted into substantial possession" of the parcels, within the meaning of sec. 706.04(3)(a), Stats., and were also performed "with the prior knowing consent or approval" of the Brevigs within the meaning of sec. 706.04(3)(b), Mattie would clearly have been entitled to specific performance of the contracts against the Brevigs under either of those subsections. The question remains whether he is entitled to the equivalent of specific performance—through the mechanism of reformation—against Webster.

Webster contends that Mattie's acts of partial performance do not entitle Mattie to enforce the contracts against him because Webster did nothing to induce those acts. The trial court did not directly address this contention, though it did find that Webster had actual notice of Mattie's equitable interest in the parcels. Under cases

decided prior to the enactment of sec. 706.04, Stats., it was clear that a subsequent purchaser with actual or constructive knowledge of a third party's interest took title subject to those interests. *Bump v. Dahl,* 26 Wis.2d 607, 612–16, 133 N.W.2d 295 (1965); *Moran v. Burmeister,* 211 Wis. 669, 677, 247 N.W. 873 (1933); *Prickett v. Muck,* 74 Wis. 199, 204, 42 N.W. 256 (1889); *Bogie v. Bogie,* 41 Wis. 209, 220 (1876). In *Moran v. Burmeister,* 211 Wis. 669, 677, the court stated the general rule in terms of the doctrine of equitable estoppel:

It is settled that when a grantee has knowledge of facts giving rise to an equitable estoppel as against his grantor with respect to lands purchased by the grantee, such estoppel may likewise be asserted or set up as a bar against the grantee.

We read sec. 706.04(3)(a), Stats., as implicitly incorporating this rule. Though the subsection does not expressly refer to the actual or constructive knowledge of the party sought to be estopped, such knowledge is the natural and probable consequence of the "substantial possession or use of the premises" by the party seeking estoppel which the subsection requires. Under this subsection, as under the case law preceding the enactment of the statute, "the purchaser is charged with notice of all of the rights of the possessor and of all the facts connected therewith which a reasonable inquiry of the one in possession would disclose." *Bump v. Dahl,* 26 Wis.2d 607, 615.

In this case, we have no difficulty in approving the trial court's findings that Webster either had actual knowledge of Mattie's interest in all three parcels or substantial opportunity and an actual duty to acquire the knowledge. Webster admitted that he had seen Mattie mowing and otherwise tending these parcels on frequent occasions before and after Webster's purchase of the farm in 1971. His claim that he attributed Mattie's activities to Mattie's ownership of the Huffman parcel

is untenable in light of the fact that he had been shown a copy of the 1965 survey, which indicated that Mattie owned both the Huffman parcel and parcel one at the time that survey was made.

Webster admits the Brevigs insisted on excepting those parcels *and* parcels two and three from the conveyance to him because they had previously agreed to sell them to Mattie. His claim that he assumed the Brevigs' deal with Mattie had fallen through because the deeds to Webster failed to exclude the parcels is not credible. He had to know that the failure to except the Huffman parcel was a mistake, since he knew that Mattie, and not the Brevigs, owned that parcel at the time the deeds were made. His assumption that the failure to except parcels one, two, and three from the same deeds was due to the Brevigs' "change of heart" rather than to a similar mistake, would have to rest on the further assumption that the Brevigs intended to make Webster a gift of these lands, since there was no increase in Webster's purchase price reflecting the value of these parcels. Neither the record of Webster's dealings with the Brevigs nor common sense provide any basis for Webster's "something for nothing" assumption. Even supposing he made it in good faith, the doctrine of unjust enrichment set forth in sec. 706.04(2), Stats., would preclude him from relying on it. *Ricchio v. Oberst,* 76 Wis.2d 545, 556, 251 N.W.2d 781 (1977), and *see In re Bratt,* 257 Wis. 447, 453, 43 N.W.2d 817 (1950).

Further, Webster's actions in cooperating with Mattie in "straightening Mattie's line" and improving the road on the east side of all four parcels in 1972 cannot be seen as the actions of one who believed he owned those parcels. The only conceivable reason for conducting the 1972 survey was to establish the correct boundaries between Webster's land and Mattie's. Webster's actions at that time, his failure to correct Mattie's assertion that

Webster was "a hell of a swell fella" for giving him six feet of land, and his failure to assert any ownership interest in the land prior to being requested to sign the quit claim deed in 1974 are all evidence supporting the Brevigs' testimony that he knew of and, in effect, acceded to Mattie's interest in these parcels even after his receipt of the incorrect deeds in 1971.

Under the circumstances of this case, we hold that Mattie was entitled to enforce the oral contracts against Webster under either the partial performance-equitable estoppel theory set forth in sec. 706.04(3), Stats., or under the unjust enrichment theory set forth in sec. 706.04(2).

*By the Court.*—Judgment affirmed.