**DAIRYLAND FINANCIAL CORPORATION, Plaintiff–Appellant,**

v.

**FEDERAL INTERMEDIATE CREDIT BANK OF ST. PAUL, Defendant–Appellee.**

**No. 87–2700.**

United States Court of Appeals, Seventh Circuit.

Argued April 12, 1988.

Decided July 14, 1988.

E. Campion Kersten, Kersten & McKinnon, Milwaukee, Wis., for plaintiff-appellant.

Roy L. Prange, Jr., Ross & Stevens, S.C., Madison, Wis., for defendant-appellee.

Before POSNER, COFFEY, and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

Dairyland Financial Corporation ("Dairyland") filed suit against the Federal Intermediate Credit Bank of St. Paul ("FICB") alleging that FICB breached an oral contract between the parties for the sale of a portfolio of agricultural loans.[1] The district court granted summary judgment in favor of FICB on the ground that enforcement of the alleged agreement was barred by the applicable statute of frauds. We affirm.

## I.

Dairyland alleges that it entered into an agreement with FICB to purchase an agricultural loan portfolio ("the loan portfolio") originated by the Farmers Credit Company ("FCC"). FCC made agricultural loans to farmers and farm enterprises. It obtained a substantial amount of its financing through direct loans from FICB and by discounting its customers' notes with FICB. FCC's obligations to FICB were secured by FCC's loan portfolio. The rights and interests of FICB and FCC in the portfolio and the other terms of the parties' lending agreement were set forth in "the General Financing Agreement" signed on August 8, 1974. In 1985 FCC sustained serious financial setbacks and was delinquent in its obligations to FICB. On January 3, 1986 FICB notified FCC that it was in default and demanded full payment under the terms of the General Financing Agreement.

During this same time period James Stopple, President of FCC, tried to organize a group of investors to purchase FICB's interest in FCC's loan portfolio. This investor group became Dairyland. On January 24, 1986 a FICB representative informed Stopple that on January 27, 1986 FICB would take physical possession of the files and documents related to FCC's loan portfolio. On January 25, 1986 Stopple called Thomas Sitz, an associate credit officer for FICB; Stopple and Sitz had previously discussed the proposed sale of the portfolio to Dairyland. Stopple claims that he told Sitz that FCC would not release the files to FICB until an agreement had been reached for the sale of the portfolio to Dairyland.

On January 27, 1986 Stopple again called Sitz to discuss the terms of the proposed sale. Dairyland contends that during this call an agreement was reached between Stopple (on behalf of Dairyland) and Sitz (on behalf of FICB). The principal terms of the alleged agreement were: (1) FCC would turn over the loan files to FICB immediately; (2) FICB would sell the loan portfolio to Dairyland for $3.8 million cash, the price to be adjusted up or down for loan payments received by FICB in the interim, administrative costs and interest; (3) Dairyland would have 45 days to close the transaction; and (4) FCC and FICB would exchange releases of legal liability.

Stopple made a second call to Sitz on January 27. This time James Fretty, an attorney and Dairyland investor, was also a party to the discussion. Pursuant to this conversation Fretty drafted a document entitled "Commitment to Sell Loans" ("the Fretty document") and forwarded it to FICB. Sitz also summarized these calls in a memorandum to his supervisor, Stuart Peterson, dated January 27, 1986. Sitz later prepared a second memo to Peterson, dated February 19, 1986, summarizing FCC's financial status and discussing the state of affairs between FICB and Dairyland. Although FCC turned over its files and documents related to the loan portfolio on January 27, 1986 allegedly in accordance with the first principal term of the asserted agreement, FICB rejected Dairyland's claims that an agreement had been reached. Dairyland never acquired the

---

1. Jurisdiction in the district court was based on diversity of citizenship. 28 U.S.C. § 1332. DFC is a Wisconsin corporation with its principal place of business in Wisconsin. FICB is a Minnesota corporation with its principal place of business in Minnesota. 12 U.S.C. § 2258. The parties agree that Wisconsin law governs this case.

loan portfolio, and filed suit in the district court alleging breach of contract.

## II.

A substantial obstacle to Dairyland's efforts to establish an enforceable contract between Dairyland and FICB is § 401.206 of the Wisconsin Statutes. This section sets forth the statute of frauds applicable to "kinds of personal property not otherwise covered." *See* Wis.Stat. § 401.206 Official UCC Comment ("Purposes: To fill the gap left by the Statute of Frauds provisions for goods, securities and security interests."). The parties agree that it governs the alleged sale of the loan portfolio. Section 401.206 provides in part:

(1) ... [A] contract for the sale of personal property for the price of $5,000 or more is not enforceable by way of action or defense unless there is some writing which indicates that a contract for sale has been made between the parties at a defined or stated price, reasonably identifies the subject matter, and is signed by the party against whom enforcement is sought or by his authorized agent.

.     .     .     .     .

(3) A contract which, but for sub. (1) would be enforceable, is enforceable:

(a) If the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under sub. (1) beyond the quantity or extent of personal property admitted....

FICB moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss Dairyland's complaint for failure to state a claim on the grounds that § 401.206 was not satisfied. While reviewing FICB's motion, the district court considered affidavits and other evidence submitted by Dairyland in addition to the pleadings. It therefore converted FICB's motion to dismiss into a motion for summary judgment and granted it.

Summary judgment should only be granted when the moving party has demonstrated, drawing all inferences in favor of the nonmoving party, that there are no issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Richardson v. Penfold*, 839 F.2d 392, 394 (7th Cir.1988). "A court should grant summary judgment when it is persuaded that, on the same evidence, it would have to reverse a jury verdict in favor of the party opposing summary judgment." *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 496 (7th Cir.1986). On appeal, we must consider the entire record in the same light, *Richardson*, 839 F.2d at 394, and may affirm on any ground that finds support in the record. *Wallace v. Greer*, 821 F.2d 1274, 1277 (7th Cir.1987).

### A.

Dairyland first contends that writings prepared by Sitz satisfy the statute of frauds. Section 401.206(1) requires that there be "some writing which indicates that a *contract for sale has been made*" between Dairyland and FICB and that the writing reasonably identify the subject matter of the sale, the loan portfolio, and that it be signed by an authorized representative of FICB. Dairyland argues that Sitz's January 27, 1986 and February 19, 1986 internal memoranda to Peterson satisfy these requirements.

The January 27, 1986 memo, dated the same day Stopple claims he reached an agreement with Sitz, stated in part that "Jim Stopple, the former President of [FCC], has come up with a proposal that he wants FICB to consider." The memo further states that "[w]e need to respond to this offer as they claim they are prepared to put it into writing." It then outlines the same basic terms that Dairyland claims compose the agreement, although it does not mention FCC's release of the loan file. Sitz concludes the memo: "I recommend that we stick to the $3.8 million figure and accept it if they can meet it." The district court found, and we agree, that this memo does not indicate that an agreement had been reached on January 27, 1986. Rather,

it demonstrates quite the opposite—that negotiations between the parties were in progress and that Dairyland had made an offer which Sitz believed FICB should consider.

The February 19, 1986 memo is similar. It provides in part:

> A group of investors have *offered* to purchase the assets of the FCC for a cash settlement of $3.8 million.... But due to the Zeller lawsuit, any sale of the loan portfolio is *prohibited.* Thus, FICB will continue to employ [two FICB employees] to collect the loan portfolio. A certified registered letter has been sent to all borrowers indicating that payments are to be made direct to the FICB.

(emphasis added). Once again the word "offer" is used. The district court found that the memorandum read as if it was drafted by a subordinate advising his supervisor of the status of negotiations. We agree with this characterization.

Dairyland points out that in an earlier draft Sitz used the word "agreed" instead of "offered" and the phrase "may be complicated" instead of "prohibited." Even this prior draft, however, did not indicate that a contract for the sale of the loan portfolio had been reached. The phrase "[a] group of investors have agreed to purchase" can reasonably be read to indicate only that the terms were acceptable to the investors, not that FICB agreed to sell its interest in the loan portfolio on these terms. This reading is supported by the next sentence which indicates that because a lawsuit had been filed by a third party it would be difficult to make such a sale. The words "any sale" are used. If a contract had already been entered into, Sitz most likely would have said that *the sales agreement* would be complicated to execute because of the lawsuit. Finally, the

phrase "any sale ... may be complicated" is followed by a statement which indicates that because of the perceived difficulty with successfully completing a sale, FICB had taken steps to directly collect the loans in the portfolio. We hold that none of these writings indicate that a contract was reached between Dairyland and FICB for the sale of the loan portfolio.[2]

#### B.

■ Dairyland also argues that the exception to the statute of frauds provided in § 401.206(3)(a) ("the (3)(a) exception") is satisfied in this case. Section 401.206(3)(a) states that a contract otherwise unenforceable because of the statute of frauds is enforceable "[i]f the party against whom enforcement is sought *admits* in his pleadings, *testimony,* or otherwise in court that a contract for sale was made...." Dairyland argues that Sitz's deposition testimony "establishes or at least raises the strong inference" that a sales agreement was reached. Appellant's Br. at 13. It repeatedly points out that we are reviewing a decision granting summary judgment in favor of FICB and that all inferences must be drawn in Dairyland's favor as the nonmoving party.

In *Gruen Industries, Inc. v. Biller,* 608 F.2d 274, 278 (7th Cir.1979) we construed the analogous provision of the Wisconsin statute of frauds applicable to the sale of securities.[3] There we stated that the testimony of the party against whom enforcement of the contract is sought does not have to expressly acknowledge the existence of the contract, but rather the testimony "need only describe conduct or circumstances from which the trier of fact can infer a contract." *Compare* Weiskopf, *In–Court Admissions of Sales Contracts*

---

2. DFC also relies on notes made by Sitz pursuant to his conversation with Stopple on January 27, 1986. These notes, however, simply set forth the material terms previously discussed and were apparently the basis for Sitz's January 27 memo. They do not indicate that a sales agreement was reached.

3. *See* Wis.Stat. § 408.319 ("A contract for the sale of securities is not enforceable ... unless

... (4) the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract was made...."). The parties agree that the notes representing the loans in question do not fall within the definition of "security" found in Wis.Stat. § 408.102. Even if the notes were securities, however, our analysis under § 408.319 would be the same. *Gruen Industries,* 608 F.2d 274.

*and the Statute of Frauds,* 19 U.C.C.L.J. 195, 207–15 (1987) (urging courts not to "boot-strap admission of oral assent to certain terms during negotiations into admission of the contract alleged").

We emphasize that the issue is not whether there is a material question of fact as to whether an oral agreement was reached between Sitz and Stopple. A material question of fact does exist: Stopple's affidavit says an oral agreement was reached and FICB denies it. The point is that regardless of whether or not an oral agreement was reached, it would only be enforceable if it satisfied the applicable statute of frauds. The (3)(a) exception provides a limited exception to § 401.206's writing requirement where the party against whom enforcement of the alleged agreement is sought admits under oath that an agreement was reached or admits to circumstances from which an agreement could be inferred. In these circumstances the admission is perceived as "the functional equivalent of a writing and hence as an adequate safeguard against fraud." Weiskopf, 19 U.C.C.L.J. at 197. Our inquiry is therefore narrow. We must determine whether *Sitz's deposition testimony* describes circumstances from which a reasonable jury could infer the existence of an agreement between FICB and Dairyland for the sale of the loan portfolio. Even under this rigorous standard we conclude that the district court properly ruled that

the (3)(a) exception was not satisfied in this case.

Dairyland directs us to many statements in Sitz's deposition which it claims describe circumstances from which an oral contract can be inferred. The vast majority of these statements, however, indicate only that Stopple and Sitz discussed the individual terms of the alleged sale—the price, closing date, date of valuation, *etc.*—which were memorialized in both Sitz's January 27 memo and the Fretty document. Dairyland puts particular emphasis on one point in Sitz's deposition testimony where Sitz acquiesces to Dairyland's counsel's characterization of this discussion as resulting in a "meeting of minds" as to the terms of the alleged sale.[4] Although discussion of these terms would be an integral part of any oral contract for the sale of the loan portfolio, it is fully consistent with a finding that Stopple and Sitz were merely negotiating over the terms of the purchase offer to be submitted by Dairyland. The discussion of the terms of the sale does not indicate that Sitz accepted the offer. In fact, Sitz's testimony specifically indicates that the terms discussed in the phone conversations between himself and Stopple were only a Dairyland proposal that FICB was to consider. For example, after Dairyland's counsel questioned Sitz about each of the conversations he had with Stopple on January 27, 1986 and the terms summarized in his January 27 memo, Sitz stated, "Again this was an outline of a proposal

4. The questioning proceeded as follows:

Q  Well, that's really not what I asked. I understand that they would have to come up with the money in order to perform their part of the contract, but apart from that, they expressed a willingness to pay that amount? Whether they'd later be able to do it is not my question, but they said they were willing to pay 3.8 million, isn't that right, in cash?
A  I would say they wanted the opportunity to be able to buy them at 3.8 cash.
Q  Well, didn't you understand them to be telling you they would pay you 3.8 million? Put it this way: You wanted 3.8 million for the portfolio and they wound up saying we will pay that 3.8 million? Isn't that what was happening that day?
A  Well, we never determined whether or not the credits could be sold.
Q  All I'm trying to find out is whether you had a meeting of the minds on the purchase

price. Didn't you have a meeting of the minds on a purchase price of 3.8 million?
A  I didn't have approval on my end.
Mr. Kersten: Move to strike as not responsive.
Q  Here's all I'm trying to get at: didn't you have a meeting of the minds between yourself and Fretty and Stopple on the purchase price of 3.8 million?
A  If credits could be sold.
Q  Well, did you have a meeting of the minds on that point?
A  Yes.
Q  And you had a meeting of the minds on each of these other points that are specifically enumerated in your Exhibit 3 [the Jan. 27 memo], the typewritten memorandum, isn't that also true?
A  I would feel that would be a safe statement, yes.
Sitz Dep. at 106–07.

that they were going to send to us." Sitz Dep. at 95. Similarly, after being questioned about notes regarding these sales terms he made during the phone conversations, Sitz stated, "The items that we just talked about would be items that would need to be addressed in a proposal advanced or submitted to our bank for an approval basis." *Id.* at 104.

When a dispute arises as to whether verbal negotiations resulted in an oral contract, the negotiations will invariably center around the terms of the proposed deal. Sitz's testimony, however, is insufficient for a reasonable trier of fact to infer that an agreement for the sale of the loan portfolio had been reached. We hold that summary judgment was properly granted in favor of FICB on the (3)(a) exception issue in this case.

### C.

■ Dairyland's final argument is that part performance of the alleged oral contract between itself and FICB prevents FICB from invoking the statute of frauds in this case.[5] The part performance doctrine is a judicial response to the primary criticism of the statute of frauds: that a party's failure to comply with the statute's requirements may permit the other party to renege on a bona fide deal.[6] *See, e.g.,* Perillo, *The Statute of Frauds in the Light of the Functions and Dysfunctions of Form,* 43 Fordham L.Rev. 39, 70 (1974). But see discussion of Wis.Stat. § 401.206(3)(a) *infra* at II B. This can defeat the first party's legitimate expectations and work a hardship in individual cases. Perillo, *The Statute of Frauds,* 43 Fordham L.Rev. at 70. The purpose of the part performance doctrine is "to prevent an injustice when the person by his performance has changed his position to his own detriment to the extent that an injustice would be done by permitting an invocation of the statute of frauds." *Toulon v. Nagle,* 67 Wis.2d 233, 226 N.W.2d 480, 488

---

**5.** Dairyland invokes language from both the doctrine of part performance and equitable estoppel to try to prevent FICB from raising the statute of frauds defense. The Wisconsin Supreme Court has stated that:

> There are a good many cases in which the court says that by reason of the plaintiff's "part performance" the defendant is "estopped" from setting up the statute of frauds. Although the doctrine of "estoppel" had an origin quite different from that of "part performance," the term has no such narrow usage or definition as to prevent its use here.... [Estoppel] is now a very loosely used term in the process of doing justice, whether because of untrue representations or of broken promises. The case is exactly the same with the term "part performance."

*Bunbury v. Krauss,* 41 Wis.2d 522, 164 N.W.2d 473, 479 (1969) (*quoting* 2 Corbin, Contracts § 422A (1950 & Supp. 1964)). *See also Toulon v. Nagle,* 67 Wis.2d 233, 226 N.W.2d 480 at 489 (part performance "is a doctrine closely resembling estoppel designed in part to prevent an injustice when the person by his performance has changed his position to his own detriment...."); *Brevig v. Webster,* 88 Wis.2d 165, 277 N.W.2d 321, 328 n. 7 (Wis.App.1979) (noting close relationship between part performance and estoppel and quoting *Bunbury*). *But compare Gillespie v. Dunlap,* 125 Wis.2d 461, 373 N.W.2d 61, 64 (Wis.App.1985) (stating that equitable estoppel has three elements: (1) action or inaction which induces; (2) good faith reliance by another; (3) to that person's detriment). We therefore treat DFC's arguments under the two doctrines together and for simplicity speak only in terms of part performance.

**6.** The part performance doctrine, unlike the (3)(a) exception, is not specifically codified as an exception to the writing requirement imposed by § 401.206. In contrast, § 706.04(3) of the Wisconsin Statutes specifically codifies the doctrine of part performance as it applies to transfers of real property. Wis.Stat. § 706.04 Committee Comment ("clarifies and restates so-called 'doctrine of part performance,' so as to identify its elements"); *Brevig v. Webster,* 277 N.W.2d 321. *See also* Wis.Stat. § 402.201(3)(c) (codifies "what part performance will be sufficient to make enforceable an oral contract [for the sale of goods] not in compliance with the statute of frauds." *Gerner v. Vasby,* 75 Wis.2d 660, 250 N.W.2d 319, 323 (1977)). Both parties agree, however, that the part performance doctrine survives and supplements Wisconsin's adoption of section 401.206 (§ 1–206 of the Uniform Commercial Code) and potentially governs the sale of the loan portfolio in this case. *See* Wis.Stat. § 401.103 (unless displaced by particular provisions of chapters 401 to 409, the principles of law and equity supplement the UCC provisions). *But compare Rossow Oil Co. v. Heiman,* 72 Wis.2d 696, 242 N.W.2d 176, 183 (1976) ("part performance, especially under the new statute, is a basis for satisfying the statute of frauds applicable to land conveyances.").

(1975).[7]

Dairyland argues that FCC had a legal right to retain the documents and files related to FCC's loan portfolio ("the loan files") and that FCC, acting through Stopple, its president, released the files to FICB as the first step in executing the alleged oral agreement between Dairyland and FICB.[8] In Dairyland's view, this constituted part performance of the alleged oral agreement sufficient to relieve it from the requirements of § 401.206.

Prior to January 27, 1986 FCC retained physical possession of the documents and files related to the loans which served as collateral for its obligations to FICB.[9] When FCC began to have financial difficulties in 1985, an FICB employee, Eldon Johnson, visited FCC on a weekly basis to review FCC's management of the loan portfolio. On January 3, 1986 FICB formally demanded full payment of FCC's obligations to FICB. On January 24, 1986 Johnson indicated to Stopple that FICB would transfer the loan files on January 27, 1986 from FCC's office to an FICB office and begin efforts to collect the loans directly.

Dairyland claims, based on Stopple's affidavit, that the following events then took place. On January 25, 1986, the day following Johnson's announcement that FICB planned to transfer the files, Stopple, after talking to his attorney, allegedly called Sitz and told him that FCC would not release the loan files unless an agreement was reached between Dairyland and FICB for the sale of the loan portfolio. On January 27, 1986 Stopple assertedly made a similar statement to Johnson when Johnson arrived to pick up the loan files. Johnson then called Sitz. Dairyland claims that this discussion lead to the later phone conversations between Stopple and Sitz that culminated in the alleged oral agreement. Stopple's affidavit states that FCC's release of the loan files was made a term of the alleged agreement to sell the loan portfolio. Stopple represents that he was reluctant to have FCC release the files before the agreement was confirmed in writing, but did so after Sitz assured him that a deal had been reached.[10] FCC's release of the files was not mentioned in either Sitz's January 27 memo, the Fretty document, or Fretty's affidavit.[11]

---

**7.** The application of the part performance doctrine by courts in the United States has been characterized as "erratic and undependable." Perillo, *The Statute of Frauds*, 43 Fordham L.Rev. at 72. This uncertainty stems from the conflict between the desire to preserve the perceived benefits of a statute of frauds, and the natural tendency to want to avoid the injustice in an individual case which accompanies a strict application of a writing requirement. Accordingly, the doctrine by its very nature is haphazard and the uncertainty it generates suggests that it should be applied with caution. *See id.* at 71. ("[A] 'creative' decision designed to do justice in the individual case may be a problem ... in that it creates precedent which can be distinguished from an 'ordinary' case only by tortuous logic devoid of common sense or policy content.").

**8.** The doctrine speaks in terms of the hardship incurred by a party who "by *his performance*" has "changed *his position* to *his own detriment*." DFC seeks to use FCC's "performance" and "detriment" as its own part performance. The district court rejected this stating that "FCC's actions are not something which [DFC] can pass off as its own part performance in an attempt to enforce the contract." *Dairyland Financial Corp. v. Federal Intermediate Credit Bank of St. Paul*, No. 86–C–683, mem. op. at 13 (E.D.Wis.

Sept. 23, 1987). On appeal, DFC argues that the district court's conclusion was erroneous. The FICB apparently agrees that performance by a third party can take an oral contract out of the statute of frauds. Appellee's Br. at 22–23. Because we find that FCC's actions do not constitute part performance, we do not reach this issue.

**9.** Apparently a substantial portion of the portfolio consisted of loans which had been discounted to FICB which were being administered by FCC on behalf of FICB. Both parties proceed under the assumption that FICB's rights with respect to these loans are the same as its rights with respect to those loans not previously discounted, but given as collateral for FCC's direct loans from FICB.

**10.** Under Wisconsin law, however, "the mere statement by a party to an oral agreement that no formalities need be executed to bind the deal does not invoke estoppel." *Wamser v. Bamberger*, 101 Wis.2d 637, 305 N.W.2d 158, 161 (Wis. App.1981) (citations omitted). *See infra* note 13.

**11.** Indeed, Fretty's affidavit states that the "Commitment to Sell Loans" document incorporates *"all of the terms* of the oral commitment

The core of the part performance doctrine, indeed its very purpose, is "the prevention of fraud or injustice when the person by his performance in part has changed his position to his own detriment." *Bunbury*, 277 N.W.2d at 328. Even if we assume that: (1) Dairyland and FICB reached an agreement for the sale of the loan portfolio, (2) FCC released the loan files pursuant to the agreement, and (3) FCC's performance can be imputed to Dairyland, it is hard to see the injustice, hardship or fraud in this case.

FCC had substantial obligations to FICB and the terms of its obligations were governed by the General Financing Agreement. Dairyland argues that "[r]elinquishing the loan files, ... *since FICB had no right to possession at that time*, was a very significant change of position and performance on the part of FCC." Appellant's Br. at 20. Section 409.503 of the Wisconsin Statutes, however, provides that "[u]nless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action." The comment accompanying this provision further explains that "the secured party's right to possession of the collateral ... accrues on default unless otherwise agreed in the security agreement." Wis.Stat. § 409.503 Official UCC Comment.

The General Financing Agreement did not otherwise provide. Rather, it specifically stated that FICB had the right to "resort to and realize upon any or all of the collateral pledged" under the agreement upon FCC's default. It is therefore incorrect to say that FICB had no right to possession of the loan files on January 27,

1986 unless the loan portfolio was not "collateral" for the obligations owed FICB under the terms of the agreement, FCC was not in default under the General Financing Agreement, or the right of FICB to take possession as specified in the loan agreement was unenforceable for some other reason.

Dairyland concedes that the loans represented by the loan documents and files were "collateral" under the agreement. It also does not claim that FCC was not in default on its obligation to FICB. Indeed, Dairyland's entire efforts to purchase the loan portfolio (originated by FCC) from FICB assumes that FICB owned the portfolio.[12]

The nub of Dairyland's argument is that "the [G]eneral [F]inancing [A]greement does not give [FICB] the right to seize the loans without court action." Appellant's Reply Br. at 10. Once FCC was in default, however, FICB was authorized to seize the collateral to help satisfy FCC's obligations to it. When FICB arrived at FCC's offices on January 27, 1986, FCC had two choices: it could have turned over the files, as it did, or it could have refused to release them, thereby preventing FICB from obtaining possession without breaching the peace. In the latter situation FICB would have been forced to proceed "by action." Under Wisconsin law this is an *ex parte* proceeding before a judicial officer under which the creditor must obtain an indemnity bond and submit a detailed affidavit in support of its "motion for possession." Wis.Stat. § 810.02. Upon receipt of the possession order, FCC would have been entitled to request a hearing to vacate or modify the order for "any sufficient cause." *Id.*, § 810.05. Dairyland does not, however, offer any explanation of the grounds that FCC might have used to resist the posses-

and agreement made the previous day between the FICB ... and [Dairyland]...."

**12.** Preliminary negotiations apparently began in late 1985 as FCC's financial problems became evident, but intensified after January 3, 1986

when the FICB formally demanded full payment of FCC's entire indebtedness under the acceleration clause of the General Financing Agreement.

sion order. The loans were acknowledged to be part of the collateral, Dairyland nowhere claims that FCC was not in default, and seizure of collateral is an accepted remedy for secured parties when the debtor defaults. *See Del's Big Saver Foods, Inc. v. Carpenter Cook, Inc.,* 795 F.2d 1344, 1349 (7th Cir.1986) (noting importance of summary repossession as a secured creditor's remedy and upholding constitutionality of Wisconsin procedures).

In essence all that resulted from FCC's decision to turn over the documents was that FICB was saved the effort of going through the Wisconsin repossession procedures. Although in many instances these procedures provide valuable protections, in this case, given FCC's uncontested default and the terms and coverage of the General Financing Agreement, the proceedings would merely have acknowledged FICB's right to seize the loan documents.[13] *See Del's Big Saver,* 795 F.2d 1344 (creditors filed motion for possession of the secured property, court order was issued, and creditor took possession of the property all in the same day). We do not find that FCC's action in turning over the loan files, allegedly in performance of the oral contract, was such that "to hold the oral contract invalid as violating the statute of frauds would in and of itself work a fraud or hardship," *Bunbury,* 164 N.W.2d at 478, nor is it comparable to the Wisconsin cases where part performance has been found. *See, e.g., Toulon,* 226 N.W.2d 480 (part performance found where person set up automobile dealership, left prior job, made cash investment, and devoted substantial effort to the business pursuant to an oral agreement which included a stock option); *Bunbury,* 164 N.W.2d 473 (part performance found where lessee paid specified rent for four years without objection from lessor pursuant to alleged oral contract); *Pick Foundry, Inc. v. General Door Mfg. Co.,* 262 Wis. 311, 55 N.W.2d 407 (lessor could not invoke statute of frauds where lessee incurred expenses related to moving equipment and inventory equal to two years worth of rent pursuant to an alleged three year lease). We hold that FCC's actions in turning over the loan files to FICB do not constitute part performance of the alleged oral contract between Dairyland and FICB.[14] The decision of the district court is AFFIRMED.

---

**13.** Dairyland does not develop the implications, if any, that might have resulted if FCC had filed for bankruptcy or gone into a receivership.

**14.** In addition to its part performance and equitable estoppel arguments, Dairyland also claims that promissory estoppel takes the alleged oral contract out of the statute of frauds. Under Wisconsin law promissory estoppel is applicable if three conditions are met: (1) the promise was such that the promissor should reasonably expect to induce action or forbearance of a substantial character on the part of the promisee; (2) the promise did induce such action; and (3) an injustice will only be avoided by enforcement of the promise. *Hoffman v. Red Owl Stores, Inc.,* 26 Wis.2d 683, 133 N.W.2d 267 (1965) (promissory estoppel found where

promisee sold business, purchased another building and moved in reliance upon a promise). Even assuming that the first two requirements are satisfied, the third requirement is "one that involves a policy decision by the court." *Id.* 133 N.W.2d at 275. Our analysis of the injustice created by FCC's release of the loan files when discussing the application of the part performance doctrine is equally applicable here and we hold that promissory estoppel does not apply. *Compare Werner v. Xerox Corp.,* 732 F.2d 580 (7th Cir.1984) (affirmed recovery under promissory estoppel where the promisee formed corporation and leased additional space pursuant to repeated promises that defendant would purchase parts manufactured in the new facility).