Rosalee **BATEMAN** and Merrill Bateman, Plaintiffs–Appellants,

v.

**CENTRAL FOUNDRY DIVISION, GENERAL MOTORS CORPORATION,** Defendant–Appellee.

No. 92–1711.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 7, 1992.

Decided May 3, 1993.

---

Bruce A. Smith (argued), Washington, IN, David V. Scott, New Albany, IN, for plaintiffs-appellants.

Wendell R. Tucker, Byron K. Mason, Baker & Daniels, Indianapolis, IN, Mary J. Wedding (argued), Richard L. Norris, Peter A. Schroeder, Norris, Choplin & Johnson, Indianapolis, IN, for defendant-appellee.

Before CUMMINGS, POSNER, and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

At the beginning of May, 1988, Rosalee Bateman joined the Jungclaus–Campbell Company ("Jungclaus") as a laborer at a construction site in Bedford, Indiana. Jungclaus was under contract with Central Foundry Division, General Motors Corporation ("General Motors") to build a research and development center at the General Motors plant in Bedford. At the time Bateman was hired, Jungclaus had constructed twenty-three pier holes, which were approximately ten feet deep and ten feet wide. In accordance with Jungclaus policy, the holes were shored up by means of plywood forms with steel bracings. In order to climb in and out of the pier holes, the workers would use the bracings, each about an inch to an inch-and-a-half wide. On May 31, 1988, Bateman slipped and fell while climbing into a pier hole, and injured her back. She sued, alleging negligence by General Motors in its failure to provide a safe workplace and to supply either warnings or a ladder to get in and out of the pier holes.

## I.

■ The district court granted summary judgment in favor of the defendants, a decision we review de novo. *Doe v. Allied–Signal, Inc.,* 925 F.2d 1007, 1008 (7th Cir. 1991); *DeBruyne v. Equitable Life Assurance Soc'y,* 920 F.2d 457, 463 (7th Cir.1990). We may affirm the district court's ruling on any basis finding support in the record. *Dairyland Financial Corp. v. Federal Intermediate Credit Bank,* 852 F.2d 242, 244 (7th Cir.1988). In examining the record, we draw all reasonable inferences from it in the light most favorable to the non-moving party. *Lohorn v. Michal,* 913 F.2d 327, 331 (7th Cir. 1990). The non-moving party must identify specific facts to establish that there is a genuine triable issue. Unless we find evidence sufficient to sustain a jury verdict in favor of the non-moving party, we will affirm the grant of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

### A.

■ Bateman does not dispute that no master-servant relationship exists between her and General Motors; she was an employee of Jungclaus, an independent contractor. Under Indiana law, an owner of property generally owes no duty to employees of independent contractors to provide a safe workplace. *Robinson v. Kinnick,* 548 N.E.2d 1167, 1168 (Ind.App.1989); *Jones v. Indianapolis Power & Light Co.,* 304 N.E.2d 337, 342 (Ind.App.1973). The landowner may, however, incur such a duty to business invitees either by contract or by conduct. *Robinson,* 548 N.E.2d at 1168; *Plan–Tec, Inc. v. Wiggins,* 443 N.E.2d 1212, 1218 (Ind.App. 1983). Bateman argues both: General Motors bound itself by contract to provide her with a safe place to work and, by its actions at the job site, assumed a duty to do so.

■ First, Bateman contends that General Motors contractually obligated itself to provide a safe workplace when it entered into a contract with Jungclaus to build the research and development center by including its house rules on safety procedures as part of the contract. At oral argument, Bateman's counsel asserted that General Motors would face liability for violations of its safety rules. But these rules don't say anything about pier holes or getting in and out of them. Consequently, General Motors' fault apparently lies in not specifying any safety procedures for pier holes. In other words, under Bateman's expansive theory General Motors faces potential liability either for taking the first step toward safety, or for taking insufficient steps, or both. The upshot of this novel approach is to give General Motors a big incentive to turn a blind eye on safety at construction sites.

Bateman therefore pins her theory on one particular provision of the house rules:

> Central Foundry reserves the right to inspect all equipment and to prohibit the use of equipment judged unsafe; also to stop work on any job.

App. 67. She concludes that General Motors had assumed responsibility for workplace safety because of the incorporation of this rule in its contract with Jungclaus. However, this language alone falls short of assuming a *duty* to inspect, let alone responsibility

for workplace safety. A contract can reserve certain rights for an owner, including inspection, without assuming control of job site safety such that the owner is liable for the injuries of an employee of the independent contractor. *See Perry v. Northern Indiana Public Service Co.*, 433 N.E.2d 44, 48 (Ind. App.1982).

In fact, the contract delegated a number of responsibilities to Jungclaus at the construction site:

> The Contractor [Jungclaus] assumes all risk of damages or injuries, including death, to any property or persons used or employed on or in connection with the work, and all risk of damages or injuries, including death, to any property or persons wherever located, resulting from any action, omission or operation under the agreement or in connection with the work.

App. 6. Jungclaus was also required to maintain worker's compensation as well as public liability and property damage insurance. Moreover, Jungclaus was specifically "responsible for the action, safety, conduct and medication of his employees." App. 61. General Motors did not assume any specific duties regarding safety at the construction site. Nothing in the contract between General Motors and Jungclaus amounts to affirmative language charging General Motors with the responsibility for the safety of Jungclaus employees at the work site.

### B.

■ Bateman also argues that General Motors assumed a duty to ensure a safe workplace by dint of its affirmative acts on the job site. In evaluating whether landowners have assumed specific duties, Indiana courts have required a significant level of supervision by the landowner or its agents before liability attaches for job site injuries.

*See, e.g., Plan–Tec*, 443 N.E.2d at 1220 (landowner had appointed safety director, issued directives regarding observance of job-site safety precautions, inspected scaffolding every morning before work began); *Phillips v. United Eng'rs & Constructors, Inc.*, 500 N.E.2d 1265, 1269 (Ind.App.1986) (landowner's construction manager had appointed a safety coordinator who conducted bi-weekly safety meetings, regularly toured job site, and advised employees in writing to remedy unsafe practices).

■ Bateman points out that Patrick Rombalski, a General Motors project engineer, was responsible for the entire Bedford construction site. He was present at the work site and inspected it on a daily basis. If Rombalski observed any safety violations during these inspections, he would report them to David Wilkerson, the job superintendent employed by Jungclaus.[1] Furthermore, during weekly progress meetings with the contractors, subcontractors, and the architect, Rombalski would discuss safety issues. However, these few incidents alone are not enough to support a conclusion that General Motors had assumed a duty to answer for the safety of Jungclaus employees. *See Teitge v. Remy Construction Co.*, 526 N.E.2d 1008, 1014–15 (Ind.App.1988) (meetings and incidental contact with employees not sufficient to "suddenly transform [architect's] role from one as an on-site coordinator to one as an on-site babysitter."); *Robinson*, 548 N.E.2d at 1169–70. Rombalski, the only General Motors employee directly involved in the construction project, was present to ensure that the construction conformed with the plans.[2] This obligation is very different from assuming responsibility for the safety of Jungclaus employees at the work site. *See Walters v.*

1. Bateman insists that Rombalski was the "safety inspector" for General Motors at the construction site since his inspections included noting safety violations. This characterization of Rombalski's role is nothing more than idle speculation.

2. The contract between Jungclaus and General Motors described Rombalski's role at the job site:

> The Owner's [General Motors'] Engineer is present for the purpose of assuring the Owner

> that the plans and specifications are being properly complied with....
>
> It is not incumbent upon the Engineer to notify the Contractor when to begin, cease, or resume work, nor to give early notice of the rejection of faulty work, nor in any way to superintend so as to relieve the Contractor of responsibility, nor of the consequence of neglect or carelessness by him or his subordinates.

App. 5.

*Kellam & Foley,* 360 N.E.2d 199, 207 (Ind. App.1977).

In fact, Wilkerson, as job superintendent, supervised Jungclaus employees and considered himself responsible for the safety of Jungclaus employees.[3] There is additional evidence that underscores the fact that Jungclaus did not cede control or active supervision over safety at the construction site. For example, Jungclaus provided all equipment necessary for its employees to work at the construction site. In addition, Jungclaus ran "tool box talk" meetings at the construction site to discuss safety measures and the proper use of equipment. Rombalski was never present at these meetings. In fact, Bateman herself had a spotty attendance record:

Q. Did you go to the meetings ever?

A. Yes.

Q. What did they talk about at the meetings?

A. Mostly bull shit.

Q. Such as?

A. I don't know, who got hurt here, who did this, I don't know, they were just talking about work in general. I only went to maybe two or three of them, but they really did not talk about anything.

App. 92. More importantly, Bateman acknowledged that Wilkerson conducted these meetings and that she would turn to Jungclaus representatives for safety assistance. Nothing in the record suggests conduct that would lead Jungclaus employees to rely on General Motors to protect their safe-

ty. Therefore, we conclude that General Motors did not obligate itself through either contract or conduct to answer for the safety of Jungclaus employees.

## II.

■ Bateman also contends that General Motors breached the duty of reasonable care that landowners owe to business invitees.[4] Under Indiana law a property owner has an affirmative duty to exercise ordinary care to keep its property in a reasonably safe condition. *McClure v. Strother,* 570 N.E.2d 1319, 1321 (Ind.App.1991); *Douglass v. Irvin,* 549 N.E.2d 368, 369 (Ind.App.1990); *see also Haugh v. Jones & Laughlin Steel Corp.,* 949 F.2d 914, 919 (7th Cir.1991). Ordinary care would include things like avoiding setting traps or creating unsafe conditions. This duty is distinct from any duty to provide a safe workplace to the employees of an independent contractor.

■ Relying on *Douglass,* Bateman argues that the scope of General Motors' duty to keep its property in a reasonably safe condition includes alerting Jungclaus employees to pier-hole hazards or providing ladders to Jungclaus employees working in the pier holes. Because General Motors had previous experience with pier hole construction, the argument goes, it was obliged to warn the employees of independent contractor Jungclaus of the need for ladders. But for our purposes, *Douglass* is relevant only insofar as it settles that superior knowledge by a landowner is neither a prerequisite nor a

---

**3.** The Jungclaus Company Safety Policy states in relevant part:

  B. Job Superintendent Will:

    1. Be responsible for on-site safety.

    2. Supply necessary personal protective equipment, job safety materials and first aid equipment.

    3. Inform the foremen not to take chances, but rather to instruct the men in proper and safe procedures.

    4. Instruct the line foremen about their safety responsibilities.

    \* \* \*

    6. Review all accidents, file full reports; and see that corrective action is taken immediately.

    \* \* \*

    8. Be familiar with the laws pertaining to safety.

Supp.App. 5.

**4.** Bateman asserts that the district court committed error in stating that General Motors owed no specific duty to her. Although its grant of summary judgment in favor of General Motors does say as much, the district court's accompanying memorandum makes clear that it meant a specific duty to provide a safe workplace. The decision, in apparent reliance on the considerations elaborated in *Hale v. Peabody Coal Co.,* 343 N.E.2d 316 (Ind.App.1976), goes on to conclude that the contract did not require the performance of intrinsically dangerous work. The district court was explaining, albeit somewhat awkwardly, that the scope of the duty to exercise ordinary care owed by a landowner to its business invitees does not in this instance include providing ladders to Jungclaus employees. *See* Appellant's Brief at A–11–12.

limitation on its liability to employees of independent contractors for on-site hazards. 549 N.E.2d at 370–71; *see McClure*, 570 N.E.2d at 1322–23; *Hoosier Cardinal Corporation v. Brizius*, 199 N.E.2d 481, 487–88 (Ind.App.1964).[5] The preliminary question then is whether General Motors' duty includes providing ladders or warnings.

■ By assuming that it does, Bateman is blurring the distinction between the duty and its breach. *See McClure*, 570 N.E.2d at 1322. General Motors invited her to come on its property for the purpose of building the research and development center. General Motors' duty consisted of maintaining the supporting structure under the pier holes in a reasonably safe condition. That duty did not require General Motors to furnish ladders or any other means for Jungclaus employees to use in getting in or out of the pier holes. Jungclaus, who dug the pier holes and installed the plywood forms, maintained sole control of the holes for the exclusive use of its employees. The reach of General Motors' duty to keep its property in a reasonably safe condition does not extend to objects within the control of the independent contractor for the sole use of its employees. *See Hale*, 343 N.E.2d at 325. Therefore, General Motors did not fail to take reasonable precautions or to warn of dangers involved in pier hole construction at the Bedford site.

Because we do not find Indiana law unclear on this point, we decline to certify any question to the Indiana Supreme Court. The decision of the district court is AFFIRMED.

---

**5.** Superior knowledge answers the question of *why* a landowner is liable rather than *whether* a landowner is liable. *See Douglass*, 549 N.E.2d at 370. In other words, the comparative knowledge of a landowner and its invitee is relevant only to the inquiry of whether a duty has been breached.